# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LAURA WOOD and PEORIA POLICE PENSION FUND, Derivatively and on Behalf of the Nominal Defendant CENTENE CORPORATION,<br><br>        Plaintiffs,<br><br>v.<br><br>MICHAEL F. NEIDORFF, ROBERT K. DITMORE, DAVID L. STEWARD, JOHN R. ROBERTS, TOMMY G. THOMPSON, FREDERICK H. EPPINGER, RICHARD A. GEPHARDT, ORLANDO AYALA, VICKI B. ESCARRA, and JEFFREY A. SCHWANEKE,<br><br>        Defendants,<br><br>and<br><br>CENTENE CORPORATION,<br><br>        Nominal Defendant. | Civ. Action No. _____<br><br><br>**PUBLIC REDACTED VERSION**<br><br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................................1

II.  JURISDICTION AND VENUE ..................................................................................4

III. THE PARTIES.............................................................................................................5

    A.   Plaintiffs.............................................................................................................5

    B.   Nominal Defendant.............................................................................................6

    C.   Director Defendants ...........................................................................................6

    D.   Executive Defendants and Former Director Defendants ...........................................8

IV.  THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS............................9

    A.   Duties of All Individual Defendants ...........................................................................9

    B.   Additional Duties of the Director Defendants on the Centene Audit
        Committee........................................................................................................14

    C.   Reporting Requirements under Generally Accepted Accounting
        Principles and SEC Regulations ................................................................17

V.   HISTORY OF HEALTH NET, CENTENE'S ACQUISITION OF HEALTH
    NET, AND CENTENE'S PUBLIC STATEMENTS REGARDING THE
    ACQUISITION............................................................................................................18

    A.   Health Net Before Its Merger with Centene ...........................................................18

    B.   Centene Conducts Due Diligence of Health Net Beginning June 2015 ..................20

    C.   The Board Unanimously Approves the Transaction on July 1, 2015 ......................23

    D.   Centene Publically Announces the Merger and, at the Board's
        Instruction, Files False and Misleading Statements in the Proxy ...........................28

VI.  HEALTH NET AND CENTENE INTEGRATE AND CENTENE
    UNDERREPORTS HEALTH NET'S LIABILITIES .......................................................30

    A.   Health Net Continues to Experience Rising Claims in California and
        Arizona and Stops Payments to Substance Abuse Facilities .....................................30

    B.   Centene and Health Net Continue to Integrate into Early 2016 ..............................33

    C.   The California Department of Insurance Questions Centene on the
        Consequences of Health Net Leaving the Individual Market in California.............37

D.    Centene Emphasizes Health Net's California Business as a Focus Area, but Fails to Report Key Health Net Financial Information During the Acquisition ..................................................................................................39

VII.    A SECURITIES CLASS ACTION IS FILED AGAINST THE COMPANY FOR MISREPRESENTATIONS MADE WITH RESPECT TO HEALTH NET ...........42

A.    Misrepresentations Made in Centene's April 2016 Form 10-Q ................................42

B.    Misrepresentations Regarding the Adequacy of Health Net's Reserves .................46

C.    The Truth Is Revealed Regarding Centene's Misrepresentations, Prompting the Filing of the Securities Action Against the Company .....................49

VIII.    DERIVATIVE ALLEGATIONS .......................................................................................55

IX.    DEMAND FUTILITY ALLEGATIONS ...........................................................................55

X.    DAMAGES TO CENTENE .............................................................................................59

XI.    CLAIMS FOR RELIEF ....................................................................................................61

COUNT I ...........................................................................................................................61

COUNT II ..........................................................................................................................62

COUNT III .........................................................................................................................63

XII.    PRAYER FOR RELIEF ....................................................................................................63

XIII.    JURY DEMAND ...............................................................................................................64

Plaintiffs Laura Wood ("Wood") and Peoria Police Pension Fund ("Peoria," together "Plaintiffs"), by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant Centene Corporation ("Centene" or the "Company") against certain of its current and former directors and officers ("Individual Defendants"). The allegations below are made upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters, based upon an in-depth review of: (a) information publicly disseminated by Centene, including its public filings with the U.S. Securities and Exchange Commission ("SEC"), and postings on its website; (b) news reports, press releases, and other publicly available sources; (c) court dockets, filings, and opinion orders related to litigation against Centene in federal courts; and (d) documents obtained pursuant to a demand made on the Company pursuant to 8 *Del. C.* §220 (the "220 Documents" and "220 Demand").

## I.    NATURE OF THE ACTION

1.    This is a shareholder derivative action brought on behalf of Nominal Defendant Centene against certain of its directors and officers for violation of the federal securities laws, breaches of fiduciary duties, and other wrongdoing. These wrongs resulted in millions of dollars in damages to Centene's reputation, goodwill, and standing in the business community, and have exposed the Company to further potential liability for violations of the federal securities laws.

2.    Beginning from at least June 2015 to the present (the "Relevant Period"), the Individual Defendants (defined *infra* ¶30) breached their fiduciary duties and the federal securities laws in soliciting a proxy sent to Centene shareholders unanimously supporting a merger between Centene and now-subsidiary Health Net, Inc. (the "Merger"). In the months before the Merger, the Individual Defendants conducted due diligence and reviewed the financial statements and other relevant information concerning the business combination of Health Net

Inc. ("Health Net") and Centene. The Individual Defendants, in connection with that review and the dissemination of the proxy, knowingly misstated Health Net's business, including revenues, income, and liabilities, and failed to correct such misstatements for over nine months.

3.     On July 2, 2015, Centene announced that it had entered into an agreement with Health Net whereby Centene would purchase all of Health Net's outstanding stock. Health Net at the time was a health insurance company that primarily offered policies in California and Arizona. Centene emphasized as the primary reason for the Merger that it would allow the Company to expand into new markets, *i.e.*, California, and realize synergies by integrating with Health Net.

4.     After the Merger announcement, the Director Defendants repeatedly received updates on the Centene-Health Net integration process, ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

5.     The due diligence and Centene's integration with Health Net, as well as the reports to the Director Defendants, continued for months as the Company sought the necessary regulatory approval from insurance regulators, including in California and Arizona. The Company initially expected the Merger to close by February 1, 2016, but the Merger was delayed pending approval from California insurance regulators and closed on March 24, 2016, just days after California regulators approved the Merger subject to specific conditions.

6. During the nine-month period when the Individual Defendants began their pre-merger due diligence until the Merger's close, Centene issued repeated statements of Health Net assets and liabilities that Centene had agreed to acquire in the Merger. Centene stated that it did not have "full access" to Health Net information about intangible assets, but internally the Director Defendants had a clear picture of the true nature of Health Net's business due to their close involvement in the Proxy.

7. It took the Company until April 26, 2016, over a month after the Merger's March 24, 2016 close, to report a full accounting of the now-combined Company's assets and liabilities. Centene reported the value of its acquired Health Net business, and assured shareholders that the reserves it had set aside to pay insurance claims, including Health Net's claims, were adequate.

8. However, as the Director Defendants had been continuously informed even before the Merger was announced, Centene's statements regarding Health Net's value and its reserves were false and misleading. Health Net had actually experienced dramatic increases in claims on its policies for substance abuse care in California, causing its liabilities to increase drastically in 2014 and 2015, and its profitability to accordingly decline. In November 2015 and into March 2016, Centene ceased payments to substance abuse treatment centers to curtail policy losses and increasing liabilities.

9. The Director Defendants had known as much since ████████████████████ ████ , but failed to act to correct the Company's misstatements. They were specifically informed in ████████████ that, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████. The Director Defendants were also informed that █████████
█████████████████████████████████████████████████████.

10. By July 2016, the Individual Defendants were forced to disclose that Health Net had incurred ***$390 million*** in liabilities which existed as of the March 24, 2016 merger date, but which Centene had previously concealed. ***The increased liabilities were greater than Health Net's entire pre-tax annual earnings in recent years, making clear that Health Net's earnings in the Proxy were vastly overstated***. Centene was forced to record these increased liabilities because its acquired California and Arizona commercial insurance products were not as profitable as previously disclosed. As the Company eventually disclosed, Health Net's revenue and income were both reduced drastically, prompting the Company to request "price increases and benefit design changes, including reductions in reimbursement for out of network services as the Company paid a higher percentage of its insurance claims." Profitability in Arizona was so poor that Centene was eventually forced to exit the market entirely.

11. As a result of these material misstatements and omissions, the Individual Defendants caused Centene to buy Health Net at an inflated price, and erased over $1 billion in shareholder value when the truth was revealed on July 26, 2016. Analysts also called into question the Company's credibility, further harming the Company by eliminating goodwill and trust in the Company's executives.

## II. JURISDICTION AND VENUE

12. Pursuant to Article III, Section 2 of the United States Constitution and 28 U.S.C. §1331 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367. The other

claims in this action are so related to the section 14(a) claims that fall within this Court's original jurisdiction that they form part of the same case or controversy under Article III, Section 2 of the United States Constitution.

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because (i) Centene maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have engaged in numerous activities that had an effect in this District.

## III. THE PARTIES

### A. Plaintiffs

15. Plaintiff Laura Wood ("Wood") is a Centene shareholder and has continuously held Centene stock since at least February 2008. Wood will fairly and adequately represent Centene's interests in this action.

16. Plaintiff Peoria Police Pension Fund ("Peoria") is a Centene shareholder and has continuously held Centene stock since at least May 2010. Peoria will fairly and adequately represent Centene's interests in this action.

**B.**      **Nominal Defendant**

17.      Nominal Defendant Centene Corporation maintains its headquarters at 7700 Forsyth Boulevard, St. Louis, Missouri 63105 and is incorporated in Delaware. Centene sells health insurance in several states in the United States, including Medicaid contracts, Medicare Advantage offerings, Medi-Cal, and certain commercial policies.

**C.**      **Director Defendants**

18.      Defendant Michael F. Neidorff ("Neidorff") is and has been a Centene director, President, and CEO of Centene since May 1996. Neidorff also began serving as the Chairman of the Board starting in May 2004. Defendant Neidorff was named as a defendant in the Securities Action.

19.      Defendant Robert K. Ditmore ("Ditmore") is and has been a Centene director since 1996. Ditmore is the current "presiding director" of the Board. Ditmore was previously President and Chief Operating Officer of United Healthcare Corporation (now known as UnitedHealth Group, Inc.), and has extensive healthcare and service industry expertise.

20.      Defendant David L. Steward ("Steward") is and has been a Centene director since May 2003. Centene's latest-filed proxy statement lists political and regulatory relationships as an area of Steward's experience.

21.      Defendant John R. Roberts ("Roberts") is and has been a Centene director since March 2004. Roberts previously served as Chairman of the Audit Committee for Regions Financial Corporation for 13 years. Centene's latest-filed proxy statement lists public company governance expertise as an area of Roberts' experience.

22.      Defendant Tommy G. Thompson ("Thompson") is and has been a Centene director since April 2005. Thompson previously served as President of Logistics Health, Inc.

from 2005 to 2011, and as secretary of the U.S. Department of Health & Human Services from 1987 to 2001. He also serves as a director for C.R. Bard, Inc., TherapeuticsMD Inc., Physicians Realty Trust and United Therapeutics Corp. Thompson has also previously served as a director for AGA Medical Corp. and Cancer Genetics. Centene's latest-filed proxy statement lists political and regulatory relationships and healthcare expertise as areas of Thompson's experience.

23. Defendant Frederick H. Eppinger ("Eppinger") is and has been a Centene director since April 2006. Eppinger is a retired director, President and Chief Executive Officer of The Hanover Insurance Group, Inc. Centene's latest-filed proxy statement lists insurance industry expertise as an area of Eppinger's experience.

24. Defendant Richard A. Gephardt ("Gephardt") is and has been a Centene director since December 2006. Centene's latest-filed proxy statement lists political and regulatory relationships as well as healthcare expertise as areas of Gephardt's experience.

25. Defendant Orlando Ayala ("Ayala") is and has been a Centene director since September 2011.

26. The Director Defendants named in ¶¶18-25 constitute all of the current directors of the Company, except for non-defendant director Jessica L. Blume, who was elected to serve on the Company's Board on February 5, 2018.

27. The Director Defendants served on the following Board committees during the following years ("C" denoting the chair), which held the following number of meetings each year:

| Audit Committee | | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
| Number of Meetings Held | 4 | 6 | 4 | 5 | 5 | 5 |
| Michael F. Neidorff | | | | | | |

| | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Robert K. Ditmore | | | | | | |
| David L. Steward | | | | | | |
| John R. Roberts | C | C | C | C | C | C |
| Tommy G. Thompson | | | | | | |
| Frederick H. Eppinger | X | X | X | X | X | X |
| Richard A. Gephardt | | | | | | |
| Orlando Ayala | | | | | | |
| Vicki B. Escarra | X | | | | | |
| **Compensation Committee** | | | | | | |
| | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
| Number of Meetings Held | 5 | 5 | 5 | 5 | 5 | 5 |
| Michael F. Neidorff | | | | | | |
| Robert K. Ditmore | C | C | C | C | C | C |
| David L. Steward | X | X | X | X | X | X |
| John R. Roberts | | | | | | |
| Tommy G. Thompson | X | X | X | X | X | X |
| Frederick H. Eppinger | | | | | | |
| Richard A. Gephardt | | | | | | |
| Orlando Ayala | X | X | X | X | X | X |
| Vicki B. Escarra | | | | | | |
| **Nominating and Governance Committee** | | | | | | |
| | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
| Number of Meetings Held | 1 | 1 | 1 | 1 | 2 | 1 |
| Michael F. Neidorff | | | | | | |
| Robert K. Ditmore | X | X | X | X | X | X |
| David L. Steward | C | C | C | C | C | C |
| John R. Roberts | | | | | | |
| Tommy G. Thompson | X | X | X | X | X | X |
| Frederick H. Eppinger | | | | | | |
| Richard A. Gephardt | | | | | | |
| Orlando Ayala | | | | | | |
| Vicki B. Escarra | | | | | | |

**D.    Executive Defendants and Former Director Defendants**

28.    Defendant Vicki B. Escarra ("Escarra") was a Centene director from March 2016 to March 2017.  Escarra informed Centene that continued service on the Board would "unduly interfere with a business opportunity" on March 1, 2017, and decided not to stand for reelection at the Company's 2017 annual meeting of shareholders.  Escarra previously served as a director of Health Net, Inc., from July 2006 to the date of the Merger close on March 24, 2016, and

became a Centene director pursuant to the terms of the Merger agreement. Centene's latest-filed proxy statement lists political and regulatory relationships and healthcare expertise as areas of Escarra's experience.

29. Defendant Jeffrey A. Schwaneke ("Schwaneke") was Centene's Chief Accounting Officer, Corporate Controller, and Senior Vice President. On March 24, 2016, Schwaneke was appointed Centene's Chief Financial Officer, Executive Vice President, and Treasurer. On April 28, 2016, the Company announced the appointment of Christopher Isaak as Centene's Chief Accounting Officer, effective immediately. Defendant Schwaneke was named as a defendant in the Securities Action.

30. Defendants Neidorff, Ditmore, Steward, Roberts, Thompson, Eppinger, Gephardt, Ayala, Escarra, and Schwaneke are collectively referred to herein as "Individual Defendants."

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.   Duties of All Individual Defendants

31. By reason of their positions as officers and/or directors of Centene, and due to their ability to control the business and corporate affairs of Centene, the Individual Defendants owed Centene and its shareholders the fiduciary obligations of loyalty and candor. The Individual Defendants were obligated to use their utmost abilities to control and manage Centene in an honest and lawful manner, and to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings, and compensation practices. This fiduciary obligation includes the obligation to accurately disseminate financial information in connection with any shareholder proxy statement disseminated to Centene shareholders, as well as the timely filing of accurate Company financial information. In sum, the Individual Defendants

were and are required to act in furtherance of the best interests of Centene and its shareholders, and not in their own personal interest or benefit.

32.     Because of their positions of control and authority as directors and/or officers of Centene, and their attendance and votes at meetings of the Board and its subcommittees, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  As to the Director Defendants, these acts include: soliciting shareholder votes based on an incomplete and misleading proxy statement, disseminating false and misleading information in the Company's financial statements, and failing to act to correct such misstatements and omissions.  Because of their advisory, executive, managerial, and directorial positions within Centene, and their attendance at meetings of the Board and its subcommittees, and through their receipt of packages of information distributed in connection with these meetings, each of the Individual Defendants had access to information regarding the improper business practices of Centene.

33.     The Individual Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Centene, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were or should have been aware, posed a risk of serious harm to the Company.

34.     Centene's Business Ethics and Conduct Policy (the "Code of Conduct") approved by the Board of Directors expressly requires, in pertinent part, that "all directors, officers and employees of Centene Corporation comply with the standards contained in the Code, immediately report any perceived violations and assist in investigating any allegations of wrongdoing."  The Code of Conduct further provides:

**Ethics**

It is the long-standing policy of the Company to observe all applicable laws. This commitment does not stop here. Even where the law is permissive, the Company shall choose the course of the highest integrity. Local customs and traditions differ from place to place. Honesty and integrity, however, are not subject to criticism in any culture. Shades of dishonesty simply invite demoralizing and reprehensible judgments. A well-founded reputation for scrupulous dealings is an invaluable asset. All directors, officers and employees must understand that at Centene Corporation, we care how results are obtained, not just that they are obtained. Each director, officer and employee must be honest and forthcoming about any questionable situation.

\* \* \*

**Financial Records & Controls – Protection of Reputation and Financial Strength**

Centene is committed to encouraging candid communication and transparency by keeping complete and accurate records and implementing appropriate system controls. This commitment includes general business and financial records. Accurate documentation should always be a priority. No employee should enter into any transaction with the understanding that it is anything other than what is described in the agreement and supporting documentation.

The unalterable Policy of the Company is that all transactions must be transparent and properly recorded. There must be no disbursement or receipt of corporate funds outside the Company's system of accountability. This means there will be no "off books" funds, payments or transactions, no "unofficial" funds, payments or transactions, and that all funds, payments and transactions must be recorded in accordance with the regular accounting process prescribed by the Company.

Our records must be complete and accurate, fully reflecting the Company's activities and transactions including claim payments, medical billing documentation, expenses, purchases, accounts receivable and sales. The information derived from these records is provided to the Company's shareholders, as well as governmental agencies; therefore, processes must follow generally accepted accounting principals [sic] and all relevant laws and regulations. Centene's reputation for integrity, as well as financial strength, depends on this.

It is difficult to delineate every practice that is or is not permissible, but certain general guidelines can be set forth. For example, a payment is prohibited if:

- It is illegal
- It is inconsistent with Centene's defined values

- No record of its disbursement or receipt is entered into the accounting records of the Company
- It is entered into the accounting records of the Company in a manner which is false or misleading.

Inter-company transactions must also comply with the highest standards of transparency. To ensure this, it is our policy to price all inter-company transactions so they comply with federal and state laws and contractual obligations. Where an appropriate market price can be determined, inter-company transactions will be priced at a level consistent with fair market value. In the absence of market pricing, charges for inter-company transactions will be based on cost and reasonable profit data so as to approximate fair market value. All transfer pricing will be regularly reviewed (including reviews by independent third parties) to ensure compliance with Company policy.

Because business records and controls can be complex, you should consult the Ethics and Compliance Department or Internal Audit Department when questions arise.

## Commitment to Honesty – Honesty is Always Centene's Policy

Honesty means communicating candidly and truthfully in all of our business relationships and transactions. While anyone can make an honest mistake, fraud is different. Fraud is not a mistake. Fraud involves deliberate deception.

Fraud is not only unethical, it is also illegal. Examples of fraud include:

- Falsifying information submitted on a claim or in a care plan
- Submitting false expense reports
- Misappropriating assets or misusing Centene property
- Inflating year-end numbers
- Forging or altering checks
- Improperly changing Company records or financial statements

## Inside Information – Fairness and Honesty in the Investment Community

Centene is committed to always being transparent in how it manages information of interest to the investment community. Employees who have access to confidential or non-public information are not permitted to use or share that information for stock trading purposes or other non-business purpose that might result in personal financial benefit or to serve as a "tip" to others. Using inside information in this manner is unethical, illegal and could result in civil or criminal penalties. It also violates our commitment to acting with the highest standard of integrity.

"Inside information" is any non-public information that a reasonable investor is likely to consider important in making investment decisions.

Examples of non-public inside information include:

- Projections of future earnings or losses
- News of a pending merger or acquisition
- News of any significant sale of assets or the disposition of a subsidiary
- Declaration of a stock split or an offering of additional securities
- Planned changes in senior management
- Significant new products
- Impending bankruptcy or financial liquidity problems
- The gain or loss of a significant vendor or customer
- The possible awarding or cancellation of a significant contract

Centene discloses financially significant information to the public by issuing a press release on earnings guidence [sic] and filing reports with the United States Securities and Exchange Commission. Information becomes public once a release appears on a national news wire, or a filing is made, after which the information is posted on Centene's website at www.centene.com.

Centene's board members, officers, certain employees and their related family members may not buy or sell Centene securities based on inside information. Once that information has been properly disclosed, board members and certain employees and their closely related family members must wait two full business days after the announcement before buying or selling Centene securities.

**Conflicts of Interest – Integrity is Our Most Important Value**

Centene is committed to communicating candidly, openly, and honestly with its employees. Employees are expected to do the same when dealing with Centene or any of its subsidiaries. Conflicts of interest arise when loyalty is divided between the Company's best interest and our own personal interests. Life is full of situations where we have multiple interests, and there is nothing unethical about that. The ethical complications arise only when we act on the basis of our own personal interests rather than those that are in the best interest of Centene.

Conflicts of interest could include:

- Working at an outside job that interferes with your position at Centene or competes with the Company
- Serving as an officer or director of or having ownership interest in another company that does business or competes with Centene
- Having a family member that has ownership interest in another company that does business or competes with Centene
- Using Centene information for your own personal gain, to benefit a family member or another company for which you serve as an officer or director, or in which you have financial interest

- Participating in business transactions for your own personal gain based on information or relationships developed as a Centene employee
- Failing to disclose that you are closely related to someone such as a vendor or customer who has sought or is seeking a financial relationship with Centene
- Employing relatives or close friends who report directly to you
- Having a romantic relationship with an employee that you supervise or that is in your line of supervision

If an employee wishes to engage in a transaction or activity which is, or potentially may be in conflict, the employee must first make a full written disclosure to the Chief Compliance Officer, an objective senior executive officer, the Chairman, President and CEO or the Board of Directors. Centene will evaluate the written disclosure and make a determination. Following this procedure will ensure that conflict of interest provisions are not violated.

**B.** **Additional Duties of the Director Defendants on the Centene Audit Committee**

35.     The Centene Board has delegated additional responsibilities to its Audit Committee (made up of Director Defendants Eppinger, Roberts, Escarra before her departure, and non-defendant director Jessica Blume) through the Company's Audit Committee Charter.

36.     The Audit Committee is responsible for assisting the Board in overseeing: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the qualifications and independence of the Company's independent auditor; (iv) the performance of the Company's internal audit function and independent registered public accountant; and (v) the preparation of the audit committee report as required by the SEC to be included in the Company's annual proxy statement. In connection with these duties, the Audit Committee Charter charges the Audit Committee with the following pertinent authorities and responsibilities:

**<u>Audited Financial Statements</u>**

7. <u>Review and Discussion</u>. The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's audited financial statements, including reviewing the Company's specific disclosures under "Management's

Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

8. Recommendation to Board Regarding Financial Statements.  The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

9. Audit Committee Report.  The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

**Review of Other Financial Disclosures**

10. Independent Registered Public Accountant Review of Interim Financial Statements.  The Audit Committee shall direct the independent registered public accountant to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the independent registered public accountant's review of interim financial information which are required to be discussed by applicable auditing standards.  The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent registered public accountant's review of interim financial information.

11. Earnings Release and Other Financial Information.  The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

12. Quarterly Financial Statements.  The Audit Committee shall meet to review and discuss with the Company's management and independent registered public accountant the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Controls and Procedures**

13. Oversight.  The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of business conduct and

ethics. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

14. Oversight of Internal Audit Function

   a.   Oversight.   The Audit Committee shall coordinate the Board of Directors' oversight of the performance of the Company's internal audit function.

   b.   Reporting Relationship.   The Audit Committee shall review the reporting relationship of the internal audit function and periodically shall meet separately with the company's internal audit executive.

   c.   Plans, Budgets and Activities.   The Audit Committee shall review for approval the internal audit function's plan, budget and activities for the upcoming fiscal year.

   d.   Review of Significant Deficiencies.   The committee shall review the status of any existing or newly identified significant deficiencies in internal controls over financial reporting on a quarterly basis.

   e.   Review of Compensation Plans.   The Audit Committee shall periodically review the incentive compensation plans for the internal audit function for potential conflicts of interest that may inhibit that function from appropriately discharging it's [sic] duties.

15. Risk Management.   The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled.

16. Hiring Policies.   The Audit Committee shall establish policies regarding the hiring of employees or former employees of the Company's independent registered public accountant.

17. Procedures for Complaints.   The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

18. Evaluation of Financial Management.   The Audit Committee shall coordinate with the Compensation Committee the evaluation of the Company's financial management personnel.

C.    **Reporting Requirements under Generally Accepted Accounting Principles and SEC Regulations**

37.    Under Generally Accepted Accounting Principles ("GAAP"), public companies must record and report financial information, including information about business combinations and financial results, according to certain standards and procedures in order to ensure clarity in financial information brought to the market. The Financial Accounting Standard Board ("FASB") has codified specific GAAP provisions for business combinations, which Centene was required to follow, codified at Accounting Standards Codification ("ASC") 805. ASC 805 requires that provisional disclosures for a business combination (referred to as the "measurement period") last for only a limited time, after which time the fair value of a transaction must be determined and disclosed. Guidance on fair value measurement and disclosure is in turn provided at ASC 820, and is designed to ensure that market-based, rather than entity-specific, measurement is used.

38.    In addition to GAAP standards, Centene and other public companies are subject to Regulation S-X promulgated by the SEC. Regulation S-X requires that financial statements prepared and submitted to the SEC must be prepared in accordance with GAAP or they will be presumed to be misleading or inaccurate, and that further information must be provided to make the financial information provided not misleading in light of the circumstance in which they were made.

39.    Further, SEC Regulation S-K, Item 303(b), codified at 17 C.F.R. §229.303, requires public companies, including Centene, to disclose in their management discussions and analyses any known trends or uncertainties that management would reasonably expect to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Regulation S-K explicitly requires that any material change in the relationship

between costs and revenues (such as a known future increase in costs of labor, or materials, or price increases) be disclosed.

40.    The Individual Defendants were aware of these requirements as a result of the due diligence they conducted before the Merger, due to the use of financial and legal experts in connection with the Merger, including Allen & Co., Evercore and Skadden, and as a result of the ongoing financial presentations provided during the integration process and post-Merger.

## V.    HISTORY OF HEALTH NET, CENTENE'S ACQUISITION OF HEALTH NET, AND CENTENE'S PUBLIC STATEMENTS REGARDING THE ACQUISITION

### A.    Health Net Before Its Merger with Centene

41.    Before being bought by Centene, Health Net sold health insurance policies to individuals, families, and businesses.  As of December 31, 2015, Health Net provided and administered health benefits to approximately 6.1 million individuals in the United States. Health Net offered behavioral health, substance abuse and employee assistance programs, as well as plans for the provision of prescription drugs.  Health Net's business was largely concentrated in California.

42.    As of 2014, the Affordable Care Act ("ACA") imposed "essential health benefit" requirements on health insurance policies, including those sold by Health Net.  By calendar year 2014, most individual and small group health insurance plans, as well as Medicaid benefit plans, were required to cover "essential health benefits," including mental health and substance abuse services.  Substance abuse benefits were one of 10 categories of benefits as defined under the new law.  *See* 42 U.S.C. §18022.

43.    In 2014 and 2015, Health Net experienced dramatic increases in claims for substance abuse-related treatments on its EPO ("exclusive provider organization") and PPO ("preferred provider organization") individual health insurance policies in California (the

"California Policies").  In 2014, Health Net earned $232 million in premiums on the California Policies, but incurred approximately $352 million in claims on those policies – a loss of $120 million.  In 2015, Health Net earned $189 million in premiums, but incurred over $475 million in claims – a loss of $286 million.

44.     Further, in connection with an application to California for rate plan modifications in May 2016, Health Net stated that, "spending for drug testing and substance abuse facilities [for Health Net] PPO plans saw a 6,359 percent increase year-over-year from 2013 to 2014 (with 2014 reflecting the first year of full ACA market reform implementation), and a 2,674 percent increase in year-over-year spending from 2014 to 2015."  According to the below analysis from the Securities Action, Health Net's elevated recorded substance abuse claims on its California Policies were consistently high throughout 2015:

| Month | Members | Medical Claims (non-Substance Abuse) | | Substance Abuse Claims | | Pharmacy Claims | |
|---|---|---|---|---|---|---|---|
| | | Paid | Yr over Yr Paid Trend | Paid | Yr over Yr Paid Trend | Paid | Yr over Yr Paid Trend |
| Jan-15 | 35,653 | 554.19 | 19.3% | 102.75 | 777.4% | 83.04 | 116.0% |
| Feb-15 | 35,927 | 508.01 | 9.7% | 156.75 | 1089.4% | 81.51 | 90.5% |
| Mar-15 | 38,239 | 559.37 | 20.9% | 314.81 | 1400.3% | 87.32 | 81.3% |
| Apr-15 | 37,546 | 502.14 | 16.5% | 291.79 | 1500.5% | 96.67 | 62.8% |
| May-15 | 37,214 | 515.94 | 17.6% | 270.38 | 1219.0% | 94.02 | 64.2% |
| Jun-15 | 37,004 | 540.70 | 14.0% | 280.03 | 1180.8% | 106.01 | 70.7% |
| Jul-15 | 36,912 | 509.75 | 10.5% | 389.75 | 1532.1% | 116.58 | 85.4% |
| Aug-15 | 36,929 | 469.44 | 3.1% | 463.59 | 2113.8% | 108.74 | 82.8% |
| Sep-15 | 36,810 | 545.60 | 21.9% | 626.69 | 2471.4% | 108.93 | 71.3% |
| Oct-15 | 36,508 | 593.12 | 30.4% | 1,003.15 | 2785.1% | 107.49 | 47.9% |
| Nov-15 | 36,548 | 521.78 | 28.0% | 935.35 | 1644.5% | 103.60 | 48.4% |
| Dec-15 | 36,188 | 532.99 | 12.3% | 826.04 | 1345.9% | 118.15 | 35.1% |
| CY 2014 | 638,521 | 452.14 | | 28.09 | | 62.33 | |
| CY 2015 | 441,478 | 529.38 | 17.1% | 471.12 | 1577.4% | 101.01 | 62.1% |

During this same period, Health Net also incurred dramatically increasing substance abuse-related claims on its health insurance policies in Arizona.

**B.     Centene Conducts Due Diligence of Health Net Beginning June 2015**

45.     Centene and Health Net began discussing a potential business combination in November 2014.  In November 2014, Defendant Neidorff contacted Health Net's CEO, Jay Gellert ("Gellert"), to discuss the "complementary aspects of their respective businesses," according to Centene's Form S-4 Joint Proxy Statement/Prospectus filed with the SEC on August 19, 2015 (the "Proxy").  Neidorff and Gellert continued their dialogue, and on March 2, 2015, they and other high-level executives at both companies met in St. Louis to discuss their respective businesses.

46.     Between March 2015 and the end of May 2015, Defendant Neidorff spoke to Gellert several times by telephone.  On June 8, 2015, Neidorff, Gellert, and other representatives from the companies held a meeting.  Neidorff informed the Health Net representatives that Centene was interested in pursuing a merger agreement.

47.     On June 13, 2015, the Health Net board met telephonically.  Gellert informed the Health Net board that Centene had expressed interest in beginning due diligence beginning June 15, 2015 to evaluate Health Net's business and a potential business combination.  The Health Net board authorized the commencement of due diligence.  On June 15, 2015, Health Net and Centene exchanged non-disclosure agreements, and on June 16, 2015, such agreements were executed and due diligence commenced.

48.     On June 16, 2015, the Centene Board met telephonically and received a presentation from Defendant Neidorff.  Neidorff noted that Centene had commenced in-person due diligence meetings at Health Net's corporate headquarters that day.

49.     Neidorff also informed the Board on June 16, 2015 that Centene had engaged McKinsey & Company ("McKinsey"), Evercore Group LLC ("Evercore"), and Allen & Company LLC ("Allen & Co.") as advisors regarding financial and business considerations, and

that Centene's management and representatives from these firms participated in the extensive due diligence. During the merger negotiations, Evercore and Allen & Co. provided to Centene executives a business and financial analysis of Health Net and an analysis of the potential pro forma financial impact of the proposed transaction on Centene. Significantly, and as discussed *infra* ¶¶55-58, both Evercore and Allen & Co. qualified their opinions by noting that the Board had specifically instructed and given its consent for these firms to use financial forecasts, estimates, and other data directly from Centene management, and specifically that Centene had made certain "adjustments" to the data relating to Health Net. As a result, neither firm gave an opinion on the accuracy or credibility of such data.

50.     On June 23, 2015, the Board met in person at Centene's corporate headquarters. Neidorff updated the Board on his personal discussions with Gellert, as well as other discussions between Centene and Health Net regarding the due diligence and other financial considerations underlying the transaction. As Centene's Proxy describes:

> The Centene Board then reviewed the key tasks completed on the potential transaction with Health Net during the week ended June 21 and ***discussed the ongoing due diligence process and findings then to date regarding synergies and financial, operational and legal matters concerning different aspects of Health Net's various businesses. The Centene Board then discussed the review conducted of Health Net's projections***, the work performed by McKinsey, and a detailed analysis of Health Net's technology and IT and the current and pending contracts with Cognizant. ***The Centene Board further discussed, among other things, Health Net's government contracts business, Health Net's management and regional leadership, Health Net's projections, regulatory considerations concerning a potential transaction***, and the potential impact on Health Net's business and operations of the pending decision of the U.S. Supreme Court in *King v. Burwell* regarding the ACA.
>
> ***Centene's financial advisors then discussed with the Centene Board a business and financial overview of Health Net and the potential pro forma financial impact of the proposed transaction on Centene based on Centene management's preliminary synergy estimates and, in the case of Health Net, the adjusted Health Net case***, as well as a preliminary overview of implied transaction metrics at various illustrative purchase prices. Centene's financial

advisors also discussed an overview of the proposed consideration, consisting of a mix of stock and cash, and potential financing plans for the proposed transaction.

[Emphasis added].

51.     On June 23, 2015, the same day that the Board met in person at Centene's corporate headquarters, high-level Health Net executives also came to Centene's corporate headquarters to attend due diligence meetings.  During this time, Defendant Neidorff and Gellert continued to discuss the transaction.  The companies continued their due diligence with conference calls and by exchanging documents through July 1, 2015.

52.     On June 30, 2015, the Board had an in-person meeting in St. Louis wherein attorneys from Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") reviewed "process considerations," and federal antitrust and state regulatory considerations.    According to Centene's Proxy:

> Mr. Neidorff provided an update on the potential transaction with Health Net and discussions with Health Net, including a summary of meetings and communications with Mr. Gellert and other discussions between the two companies and their respective representatives.  In addition, Mr. Neidorff and representatives of Skadden discussed the status of negotiations with Health Net on certain material terms of the potential transaction, including with respect to Centene's obligations to obtain requisite regulatory approvals, the circumstances and amount of potential termination fees and the status of the contemplated financing plans related to the potential transaction.  The Centene Board also reviewed the strategic rationale for the potential transaction.
>
> ***Members of Centene's management then discussed strategic considerations in proceeding with the potential transaction and reviewed the status of Centene's due diligence review.    Centene's management further discussed PricewaterhouseCoopers' review of Health Net's public financial statements, tax papers and quality of earnings analysis, as well as IT and HR related matters***.  The Centene Board and Centene's management, together with Centene's advisors, continued to discuss potential synergies arising from the potential transaction and the likelihood of Centene achieving such synergies.
>
> The Centene Board then reviewed the terms of the contemplated financing for the potential transaction and the terms of the current draft of Centene's commitment letter.

Mr. Neidorff noted that a request had been made by Health Net to add current members of the Health Net Board to the Centene Board following completion of a potential transaction with Health Net and that Centene had proposed one board seat to Health Net as part of the negotiations. The directors discussed the possibility of expanding the existing Centene Board. Following this discussion, representatives of Skadden reviewed with the Centene Board the fiduciary duties of the directors under Delaware law.

Representatives of Skadden then reviewed written materials describing the merger agreement. Among other things, Skadden discussed the potential tax-free treatment of the equity portion of the consideration payable to Health Net stockholders; the fact that Health Net stockholders would be entitled to appraisal rights in connection with the potential transaction; the contemplated treatment of existing Health Net equity awards; the conditions to closing; the nature of and obligations regarding financing; deal protection provisions, including, among others, limitations included in the merger agreement on the ability (subject to certain exceptions) of each of Centene and Health Net to solicit competing acquisition proposals or change its recommendation to their respective stockholders with respect to the potential transaction, the circumstances under which the merger agreement may be terminated by either party and the related termination fee amounts; and the obligations of each party to obtain required regulatory approvals; and the proposed voting agreements from the chief executive officer of each party.

***Centene's financial advisors then reviewed with the Centene Board financial aspects of the potential transaction, including, without limitation, a summary of financial terms of the potential transaction and implied equity and enterprise values for Health Net based on the proposed purchase price, as well as implied purchase price multiples and premiums.*** During the course of these discussions, Centene's financial advisors also summarized Centene's and Health Net's historical relative stock price performance, provided an overview of selected companies and selected precedent transactions in the managed care industry, implied premiums paid in selected transactions and ***the discounted cash flows of Health Net and Centene based on the adjusted Health Net case and the Centene management forecast, respectively.*** The Centene Board additionally discussed with Centene's management and its financial advisors potential synergies related to the potential transaction. After further discussion, the Centene Board instructed Centene's management to continue negotiations of the proposed price and other terms of a transaction with Health Net.

[Emphasis added].

## C. The Board Unanimously Approves the Transaction on July 1, 2015

53.     On the evening of July 1, 2015, the Centene Board met to discuss and evaluate the

Merger. At the July 1, 2015 meeting, the Board unanimously approved the merger agreement

and underlying transactions. The Company's Proxy expressly states that the Board considered the following pertinent factors in making its determination:

- *The review of Centene's and Health Net's business, strategy, current and projected financial condition, current earnings and earnings prospects*, and the current and prospective regulatory environment;

- The combination of Health Net and Centene would maintain and enhance Health Net's **strong commercial business in California**, which could also serve as a model for other states in which similar opportunities can be identified;

- Both Centene and Health Net were leading companies in responding to the ACA and building low cost, high quality solutions for the future and, although they have common business liens and focus on the ACA, there is little overlap in their service areas, allowing for the opportunity to expand the reach of their low cost, high quality solutions by geography and product line;

- A review of the potential strategic and financial benefits associated with the transaction, including…[t]he addition of incremental scale in the western United States, including through Health Net's complementary network, which Centene believes will provide it with a stronger presence to compete more effectively in the Medi-Cal market and other Mediacaid and Medicare markets, including in Arizona, Oregon and Washington;

- *Greater participation in California's dual eligible demonstration program given Health Net's leading share in this market*; [and]

- *The fact that Centene's management team and legal and financial advisors were involved throughout the negotiations and updated the Centene Board which provided additional perspectives on the negotiations*.

[Emphasis added]. The Proxy likewise listed the following potential risks as factors that the Board specifically reviewed in making its determination:

- Certain risks inherent in Health Net's business and operations, including those identified in Health Net's SEC filings;

- The general risks of market conditions that could affect the price of Centene and Health Net common stock, as well as the other risks and uncertainties discussed in Health Net's public filings with the SEC; [and]

- The fact that certain senior executives of Health Net would receive substantial payments in connection with the merger, and that Health Net may also be obligated to make gross-up payments to those executives for the amount of certain taxes resulting from some of these payments.

54. Representatives from Skadden updated the Board on negotiations with Health Net and reviewed the terms of the draft merger agreement. The Board received a copy of the draft, along with a summary of material terms.

55. At this meeting, Allen & Co. presented to the Board on the Merger and provided a written opinion regarding the fairness of the Merger. Information about the July 1, 2015 Allen & Co. opinion reviewed by the Board was attached and incorporated by reference into Centene's Proxy Statement. Allen & Co. stated that it had, *inter alia*:

- reviewed the financial terms and conditions of the merger as reflected in a draft, dated July 1, 2015, of the merger agreement;

- reviewed certain publicly available historical business and financial information relating to Centene and Health Net, including public filings of Centene and Health Net, and historical market prices and trading volumes for Centene common stock and Health Net common stock;

- reviewed certain financial information relating to Centene and Health Net, including certain internal financial forecasts, estimates and other financial and operating data of Centene and Health Net provided to or discussed with Allen & Company by the respective managements of Centene and Health Net (**as adjusted, in the case of the Health Net forecasts, estimates and other financial and operating data, by the management of Centene**); and

- held discussions with the managements of Centene and Health Net relating to the past and current operations and financial condition and prospects of Centene and Health Net.

[Emphasis added].

56. Allen & Co., in a July 1, 2015 letter to the Board delivered in connection with its opinion on the Merger, also stated the following regarding the limitations of its opinion:

Our opinion as expressed herein reflects and gives effect to our general familiarity with Centene as well as information which we received during the course of this

assignment, including information provided by the managements of Centene and Health Net in the course of discussions relating to the Transaction as more fully described below. In arriving at our opinion, we neither conducted a physical inspection of the properties or facilities of Centene, Health Net or any other entity nor made or obtained any evaluations or appraisals of the assets or liabilities (contingent, off-balance sheet or otherwise) of Centene, Health Net or any other entity, or conducted any analysis concerning the solvency or fair value of Centene, Health Net or any other entity. *We are not actuaries and our services did not include any actuarial determination or evaluation by us, any attempt to evaluate actuarial assumptions or allowances for losses with respect thereto or any analysis of the adequacy of reserves for losses or other matter and, accordingly, we have assumed that each of Centene and Health Net has, and the pro forma combined company will have, adequate reserves for losses and other matters.*

* * *

*In rendering our opinion, we have relied upon and assumed, with your consent and without independent verification, the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information available to us from public sources, provided to or discussed with us by Centene and Health Net or their respective representatives or otherwise reviewed by us. With respect to the financial forecasts, estimates and other information and data relating to Centene and the potential cost savings anticipated by the management of Centene to result from the Transaction that were directed to utilize in our analyses, we have been advised by the management of Centene and we have assumed, with your consent, that such forecasts, estimates and other financial and operating data have been reasonably prepared in good faith reflecting the best currently available estimates and judgments of such management as to the future financial and operating performance of Centene, such cost savings and the other matters covered thereby.* With respect to the financial forecasts, estimates and other information and data (as adjusted by the management of Centene) relating to Health Net that we were directed to utilize in our analyses, we have been advised by the managements of Health Net and Centene and we have assumed, with your consent, that such forecasts, estimates and other financial and operating data have been reasonably prepared in good faith reflecting the best currently available estimates and judgments of such managements, as the case may be, as to the future financial and operating performance of Health Net and the other matters covered thereby. We assume no responsibility for and express no view or opinion as to any such financial forecasts, estimates and other financial and operating data or the assumptions on which they are based. We have relied, at your direction, upon the assessments of the managements of Centene and Health Net as to among other things, (i) the potential impact on Centene and Health Net of certain market and other trends in and prospects for, and governmental, regulatory and legislative policies and matters relating to or affecting, the managed care and specialty services sectors of the healthcare industry, including with respect to government subsidized

healthcare programs and reimbursement, (ii) existing and future relationships, agreements and arrangements with, and the ability to attract and retain, key employees and commercial relationships with hospitals, physicians and other healthcare providers, (iii) the technology and intellectual property of Centene and Health Net and (iv) the ability to integrate the business of Centene and Health Net. ***We have assumed, with your consent, that there will be no developments with respect to any such matters that would have an adverse effect on Centene, Health Net or the Transaction*** (including the contemplated benefits thereof) or that otherwise would be meaningful in any respect to our analyses or opinion.

\* \* \*

Our opinion is limited to the fairness, from a financial point of view and as of the date hereof, to Centene of the Merger Consideration . . . .

[Emphasis added].

57. Evercore also presented to Centene's Board at the July 1, 2015 meeting. The Board received an oral presentation from Evercore, as well as a written opinion. Information about the Evercore opinion was also attached and incorporated by reference into Centene's Proxy Statement. Evercore stated that it had, *inter alia*:

- reviewed the Centene management forecast, the Health Net management forecast, ***the adjusted Health Net case and the pro forma combined company forecast*** [];

- discussed the past and current operations, financial projections and current financial condition of each of Centene and Health Net with their respective managements; and

- ***considered the potential pro forma impact of the merger on Centene, based on inputs and analysis provided by Centene management***.

[Emphasis added].

58. Evercore also submitted a July 1, 2015 letter to the Board in connection with its opinion on the merger stating the following limitations regarding its opinion:

For purposes of our analysis and opinion, we have assumed and relied upon, without undertaking any independent verification of, the accuracy and completeness of all of the information publicly available, and all of the information supplied or otherwise made available to, discussed with, or reviewed by us, and we assume no liability therefor. ***With respect to the projected financial data relating to Centene and Health Net referred to above, we have***

*assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the respective managements of Centene and Health Net as to the future financial performance of the companies under the assumptions reflected therein. We express no view as to any projected financial data relating to Centene or Health Net or the assumptions on which they are based*. We have relied, at your direction, without independent verification, upon the assessments of the management of Centene as to the Estimated Synergies.

* * *

We have not made nor assumed any responsibility for making any independent valuation or appraisal of the assets or liabilities of Centene or Health Net, nor have we been furnished with any such appraisals, nor have we evaluated the solvency or fair value of Centene or Health Net under any state or federal laws relating to bankruptcy, insolvency or similar matters. Our opinion is necessarily based upon information made available to us as of the date hereof and financial, economic, market and other conditions as they exist and as can be evaluated on the date hereof. It is understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise or reaffirm this opinion.

We have not been asked to pass upon, and express no opinion with respect to, any matter other than the fairness, from a financial point of view, of the Merger Consideration to Centene.

[Emphasis added].

### D. Centene Publically Announces the Merger and, at the Board's Instruction, Files False and Misleading Statements in the Proxy

59. Centene and Health Net entered into an agreement and plan of merger on July 2, 2015 (the "Merger"). Before the market opened on July 2, 2015, Centene and Health Net jointly announced that the boards of both companies had unanimously approved the Merger and that Centene would acquire Health Net for an estimated total transaction value of approximately $6.8 billion. The release stated that Centene's consideration for Health Net would be $78.57 per share, a premium of approximately 21% over Health Net's closing stock price on July 1, 2015, and of 26% on June 1, 2015. Neidorff justified the value of the Merger in the press release by stating: "Health Net's presence in California and other key western states is complementary to

our offerings, allowing us to bring additional innovative solutions to the healthcare market." The release also listed as a "strategic benefit" that "[t]he transaction will provide Centene with access to California's dual demonstration program and expansion in other Medicaid and Medicare programs in the Western United States, including Arizona, Oregon and Washington."

60.     At 8:30 a.m. on July 2, 2015, Centene and Health Net held a conference call to discuss the Merger. On the call, Neidorff stated, "we know Health Net well and we respect their team and their accomplishments." Neidorff justified the Merger by stating that "[i]mportantly, combining with Health Net is expected to increase and enhance our presence in the California Medicaid Program . . . ."

61.     Centene continued to emphasize that Health Net's business in California was central to their purpose in acquiring the company. On July 14, 2015, Centene posted a PowerPoint presentation on its website which was also filed with the SEC and which listed Health Net's "deeper penetration in California" as the first "growth driver[]" of the Merger. The presentation further stated that the Merger was expected to be "greater than 20% accretive to Adjusted EPS in first full year." The Company repeated these statements on July 15, 2015, September 9, 2015, and November 10, 2015.

62.     ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████  ███████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████

63.     On August 19, 2015, Centene filed the Proxy with the SEC, including a joint proxy statement and prospectus regarding the proposed merger.  The Proxy was signed by Director Defendants Neidorff, Ayala, Ditmore, Eppinger, Gephardt, Roberts, Steward, Thompson, and Executive Defendant Schwaneke.  The Proxy listed the Board's stated reasons for unanimously approving the Merger (discussed more fully *infra* ¶126), including that the Merger "would maintain and enhance Health Net's strong commercial business in California, which could also serve as a model for other states in which similar opportunities can be identified."  The Proxy stated that "Centene's management team and legal and financial advisors were involved throughout the negotiations and updated the Centene Board which provided additional perspectives on the negotiations," supporting the Board's decision to unanimously approve the Merger.

64.     In addition to the false and misleading statements in the Proxy itself, the Individual Defendants incorporated by reference Health Net's Form 10-K Annual Reports for each year of the five-year period ended December 31, 2014, and Health Net's Form 10-Q Quarterly Report for the quarter ended June 30, 2015.  This incorporation was further misleading in that it failed to disclose the material trends that made Health Net's California and Arizona business less profitable, and additionally failed to disclose the increasing liabilities Health Net incurred on those plans but refused to pay to substance abuse facilities.

## VI.     HEALTH NET AND CENTENE INTEGRATE AND CENTENE UNDERREPORTS HEALTH NET'S LIABILITIES

### A.     Health Net Continues to Experience Rising Claims in California and Arizona and Stops Payments to Substance Abuse Facilities

65.     In the second half of 2015, Health Net began systematic efforts to reduce its payments for submitted substance abuse-related claims in California and Arizona.  In or around November 2015, Health Net's payments to substance abuse treatment centers became sporadic.

By January 2016, Health Net had instituted a special investigation unit ("SIU") "audit" that involved all or substantially all drug and alcohol treatment centers in California that submitted claims to Health Net. As part of the SIU "audit," Health Net ceased reimbursing most, if not all, of these drug and alcohol treatment centers for treatments rendered after January 15, 2016. Leading up to the March 24, 2016 merger date, Defendants were well aware of the "audit," which was reported in industry press at the time and is currently the subject of litigation in courts in California and Arizona. Third-party payers whom Health Net refused to pay during the "audit" have sued Centene to recover for the unpaid claims.

66. In conjunction with Health Net's cessation of payments, Health Net sent the drug and alcohol treatment facilities form letters from the Health Net Director of SIU, Matthew Ciganek. The form letters imposed onerous burdens on the drug and alcohol treatment centers while suspending payments. One such letter purportedly sent to a substance abuse treatment provider, made available on industry reporting site *Modern Healthcare*, is attached hereto as Exhibit A. Among other things, the form letters (i) failed to identify any specific misconduct by treatment centers, yet mentioned Health Net's "right to institute legal proceedings" and "seek appropriate sanctions from the court"; (ii) requested extensive and unusual amounts of documentation in a short time frame, including "all documents" related to various categories of documents within fifteen days of the facility receiving the letter; (iii) were followed by numerous duplicate letters requesting copies of the treatment centers' licenses and other information, at times even after such information had already been provided to Health Net; and (iv) imposed substantial costs of compliance in terms of administrative burden and delivery costs: among other things, failing to provide street addresses for delivery and initially refusing to receive any of the requested records electronically.

67.    The SIU "audit" and Health Net's delayed payments for substance abuse-related claims extended for months in late 2015 and early 2016.  During and after this time, the treatment centers refused to accept Health Net patients, driving down Health Net's incurred claims.  Health Net also unilaterally changed treatment codes billed by medical professionals in order to lower costs, even though Health Net policies did not permit such unilateral changes.  In or about May 2016, Health Net began to remit payment on overdue reimbursements.  The payments, however, were frequently incorrect and insufficient.

68.    In May 2016, the CEOs and owners of a group of California treatment facilities sent California Department of Insurance ("CDI") Commissioner Dave Jones a letter informing him of the "inappropriate dragnet audit of California substance abuse treatment facilities by Health Net" (attached hereto as Exhibit B).  Individual facilities that had previously filed formal complaints with the CDI reported receiving cease and desist letters from Health Net, prompting the concerted effort.

69.    The joint letter alerted the Commissioner that Health Net's "dragnet audit" applied to "essentially every [California] facility," and was retroactive in the sense that it requested documentation for treatment already completed, amounting to a clawback of reimbursements already provided.  In addition, at least one treatment facility reported receiving payment from Health Net in the form of a check, only to later discover that Health Net had placed a stop payment on the funds.  And even for facilities who received payments on claims, "[i]nstead of paying 75% of billed after all co-insurance has been met, Health Net is now paying pennies on the dollar."  The treatment centers reported to the California Department of Insurance that they would be unable to accept future Health Net policyholders unless Health Net reimbursed them for claims.  Treatment centers in Arizona reported similar complaints to the

Arizona Department of Insurance, stating that Health Net had also failed to reimburse those treatment centers.

70.     On May 31, 2016, the CDI announced that it had begun an inquiry into whether Health Net had failed to properly submit payment for insurance claims to over 118 addiction treatment centers in California and Arizona.  On June 23, 2017, the CDI issued an order to show cause regarding the complaints it had received from the substance abuse treatment centers over the delayed, denied, or attempted clawback payments.  CDI stated that Health Net had engaged in unfair or deceptive business practices by failing to settle provider claims in good faith, even where its liability was reasonably clear, and that CDI would subject the company to a $10,000 penalty for each violation.

71.     The SIU "audit" thus provided Health Net a means to artificially and temporarily drive down the actual costs of its poorly designed substance abuse policies.

**B.      Centene and Health Net Continue to Integrate in Fall 2015, and Shareholders Approve the Merger Based on the Company's False and Misleading Statements**

72.     While Health Net systematically restricted its payments to substance abuse facilities, Centene stated that it was making progress on its integration of the Health Net and Centene businesses.  On September 9, 2015, Centene presented at the Wells Fargo Healthcare Conference in Boston, Massachusetts.  During the presentation, Defendant Neidorff stated that Centene was "look[ing] at some of the upside" of the merger "as we go through the integration, and that's going incredibly well – working very well."  Neidorff stated that "Health Net will give us great penetration in California," that Health Net would contribute to Centene's growth in the short term, and that "I said at the time we did this deal, we have good visibility into 2016, we have pretty good visibility into 2017."  Neidorff reiterated that, regarding Health Net's financials, "we have good visibility on 2016."

73.     On September 21, 2015 Centene filed its definitive proxy statement for the special meeting of shareholders to vote on the Health Net merger.  On October 23, 2015, Centene's shareholders voted to approve the merger based on the false and misleading information contained in the Proxy.

74.     On October 27, 2015, during a quarterly investor conference call, Defendant Neidorff reassured Centene investors regarding the integration with Health Net.  Responding to a question from analyst Michael Baker of Raymond James & Associates, Inc. regarding "who's heading up the integration effort," Neidorff responded that "Cindy Brinkley [Centene's Executive Vice President of International Operations and Business Integration] is heading up the integration," "the Health Net people are fully engaged in participating," and "speaking on behalf of the whole management team, the Board, we are very pleased with the progress at how it's going."

75.     ███████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████

**C.**      **After the Merger Is Approved By Shareholders, the Board Continues to Conceal the True Nature of the Company's Financial Condition into 2016, and Learns the Full Extent of Health Net's Financial Trouble**

76.      On December 9, 2015, Centene presented at the Oppenheimer Healthcare Conference in New York, New York. During the presentation, Defendant Neidorff stated that "[t]here's probably no time in [Centene's] history or in its future that will be more transitional than what we've just done with Health Net. It has taken us from an also-ran to one of the big four. ***It has given us a critical mass and a capability and size that builds a lot of stability into what we're doing.***" [Emphasis added]. Neidorff stated regarding the Health Net merger that "[w]e have good growth and have good visibility into 2016, 2017, a little bit of 2018." Neidorff stated that "Health Net had some . . . 14 [or] 15 payables or receivables we'll write off . . . at the time we close."

77.      ████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████:

-    ████████████████████████████████████████████
█████████████████████████████████████████████████████

- ██████████████████████████████████

• ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████.

But, no corrective action was forthcoming. Indeed, it would not be until July 2016 that the Company finally acknowledged liabilities had increased by roughly $300 million "***based on costs trends existing prior to the acquisition date***" [emphasis added], *i.e.*, liabilities had increased because the Company's costs had skyrocketed and revenues had greatly decreased, impacting earnings. Another reason for the reduced revenues was that Centene ██████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████. [Emphasis added].

78.     The Board also learned that ███████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████:

• ██████████████████████████████
████████████████

• ██████████████████████████████
█████

• ██████████████████████████████
██████

• ██████████████████████████████
█████████

• ██████████████████████████████
███

[Emphasis added].

79.   Despite this rosy outlook, ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

80.   On December 18, 2015, Centene held an investor conference call regarding the Company's financial guidance for 2016. During the call, Cindy Brinkley stated that, in anticipation of the merger closing in February 2016, the Company "embarked upon a very, very robust planning process," and that "we are making significant progress on our integration plans and where we are with the entire transaction."

81.   During the December 18, 2015 conference call, Brinkley further noted that Centene was at the time working with the California regulators regarding the Merger and that Centene would have a hearing with the California regulators on January 22, 2016. Brinkley stated that Centene was in the process of "realizing the growth opportunities and putting the company together."

**D.    The California Department of Insurance Questions Centene on the Consequences of Health Net Leaving the Individual Market in California**

82.   On January 22, 2016, CDI held a six-hour-long public hearing about the Merger, with testimony from Centene executives, including Defendant Schwaneke, consumer advocates and the public. At the hearing, Centene executives emphasized Centene's small presence in California, and the fact that Health Net would grant Centene access to the California commercial insurance market. The General Counsel for CDI, John Finston, asked Defendant Schwaneke about the impact the Merger would have on Centene's debt and whether Health Net's operating

levels in California would be changed as a result of the debt. Schwaneke answered that "we would expect to maintain the same or similar level of composition Health Net Life Insurance Company has had in the past, and we would look to continue whatever their history or the California practices were," and that "our intent is to maintain a similar level of capitalization as Health Net Life Insurance has in the past." CDI Commissioner Jones and General Counsel Finston repeatedly asked Centene to make assurances and commitments to maintain Health Net's commercial business in California and to improve its consumer quality ratings, given Health Net's poor quality ratings in the state. Centene executives offered vague assurances throughout the hearing, but no specific or enforceable guarantees were provided.

83. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

84. The Director Defendants knew through Centene's due diligence that Health Net had stopped payments on substance abuse-related claims, and that ████████████████████
████████████████████████. The Director Defendants knew by ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

- 38 -

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ .

**E.    Centene Emphasizes Health Net's California Business as a Focus Area, but Fails to Report Key Health Net Financial Information During the Acquisition**

85.    In the months leading up to the closing of the Merger on March 24, 2016, Centene continued to be particularly focused on Health Net's California policies as part of Centene's efforts to obtain approval from California's insurance regulators.  Centene originally planned to complete the Merger in February 2016, but the transaction was delayed because California regulators had not yet approved the Merger.

86.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████    ████████████    ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████    [Emphasis added].    ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ :

- ████████████████████████████████████████████████████████████████
- ████████████████████████████████████████████████

- ██████████████████████████████████████████████ed
- ████████████████████████████████████████████████

Despite Centene's public reliance on "synergies" regarding organizational structure to provide value for the Merger, the Board knew that ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████

87.     In a press release and Form 8-K published on February 9, 2016, Centene stated that, "[t]he Health Net transaction remains subject to California regulatory approval."

88.     In numerous SEC filings and other public statements in late 2015 and early 2016, Centene, at the direction of the Individual Defendants, repeatedly stressed the need for regulatory approval as a precondition to the Merger's closing.  For instance, Centene's Form S-4 and S-4/A joint proxy statement/prospectus filed on August 19, 2015 and September 17, 2015, signed by the Director Defendants, stated that, "[p]ursuant to the insurance laws and, in some instances, the health care laws of Arizona [and] California[,] . . . applicable regulatory authorities must approve of . . . Centene's acquisition of control of Health Net's health maintenance organization and insurance companies."  Centene stated that "[t]he parties expect to complete the merger after all of the conditions to the merger in the merger agreement are satisfied . . . , including . . . all required regulatory approvals."

89.     Until regulatory approval was obtained and the Merger closed, Centene refused to provide certain financial information regarding the Health Net acquisition.  The Director Defendants, despite knowing by ██████████████████████████████████████ ██████████████████████████████████████████████████, allowed Defendant Schwaneke to state on December 18, 2015, during a Company Investor Day, "[w]ith

regulatory approvals pending, we will not be able to provide additional details associated with the 2016 guidance other than what is presented here today.  Once all regulatory approvals have been received and the transaction is closed, we will provide full details of our 2016 guidance." On January 11, 2016, Neidorff told investors during a JPMorgan Healthcare Conference that "the closing is subject to regulatory approval.  And until we receive the final approval, we're going to limit what information we provide to what we did at our Investor Day in terms of revenue and earnings."

90.     As discussed *supra* ¶77, the Board saw ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████.  Yet, despite the fact that the Board unanimously approved the Merger based on these false figures, the Board took no action to remedy the false statements and Centene's deliberate withholding of true Health Net revenue and earnings figures as the regulatory approval process continued.

91.     The ongoing approval requirements from regulators in California allowed Centene to avoid reporting revenue as a consolidated company with Health Net.  During a Company conference call with investors on February 9, 2016, Defendant Schwaneke stated that "one month of Health Net revenue is approximately $1.3 billion" and as "the transaction remains subject to regulatory approval in California," the "actual closing date of the Health Net transaction will determine the number of months and days of Health Net results that will be included in our consolidated financial statements for 2016."  As analysts at UBS noted, "[a] one-month delay [in the merger] would impact 2016 revenue outlook by roughly $1.3 [billion]."

92.     In March 2016, Centene obtained regulatory approval to consummate the transaction from the California Department of Managed Health Care (DMHC) and the California Department of Insurance (CDI).   Morgan Stanley issued a report dated March 22, 2016 discussing the scrutiny that regulators were applying to the proposed merger:

> Both of California's insurance regulators held hearings in December and January about the proposed CNC/HNT deal.  However, Commissioner Dave Jones from CDI appeared to be more critical of the merger.  According to California Healthline, Jones spent six hours in a hearing Jan. 22 grilling executives and industry experts on the proposed Centene-Health Net merger.

93.     The Individual Defendants were further focused on Health Net's California insurance policies in the months leading up to the merger because the CDI subjected its merger approval to a number of conditions regarding those policies.  In a report dated March 22, 2016, Morgan Stanley described ten conditions on CDI's approval of the merger, including a "commitment to growing [Health Net's] commercial business in the state [of California] including participation on the exchange."  In a report dated March 22, 2016, Sterne Agee noted additional CDI requirements, including that Centene was required to "maintain and grow [Health Net's] commercial business in the state," "provide sufficient provider networks," "continue to offer products on the California exchange," "improve the quality of care to consumers," and "certify that no costs of the merger will be passed along to consumers."

94.     On March 24, 2016, Centene announced that it had completed its acquisition of Health Net.

## VII.   A SECURITIES CLASS ACTION IS FILED AGAINST THE COMPANY FOR MISREPRESENTATIONS MADE WITH RESPECT TO HEALTH NET

### A.     Misrepresentations Made in Centene's April 2016 Form 10-Q

95.     After the Merger was complete, Centene filed a Form 10-Q with the SEC on April 26, 2016 (the "April 2016 Form 10-Q") that reported the purported value of the Health Net assets

that Centene had acquired, and the Health Net liabilities that Centene had assumed in the Merger

(in millions):

**Assets acquired and liabilities assumed**

| | |
|---|---|
| Cash and cash equivalents | $ 1,422 |
| Premium and related receivables | 1,076 |
| Short term investments | 40 |
| Other current assets | 670 |
| Long term investments | 1,965 |
| Restricted deposits | 36 |
| Property, software and equipment, net | 43 |
| Intangible assets | 1,500 |
| Other long term assets | 203 |
| Total assets acquired | 6,955 |
| | |
| Medical claims liability | 1,370 |
| Borrowings under revolving credit facility | 285 |
| Accounts payable and accrued expenses | 1,928 |
| Return of premium payable | 375 |
| Unearned revenue | 117 |
| Long term deferred tax liabilities | 415 |
| Long term debt | 418 |
| Other long term liabilities | 369 |
| Total liabilities assumed | 5,277 |
| | |
| Total identifiable net assets | 1,678 |
| Goodwill | 3,601 |
| Total assets acquired and liabilities assumed | 5,279 |

96. 



97. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████, were reported to

shareholders in the April 2016 Form 10-Q.

98.     Centene represented that the Health Net figures showed the "fair value" of Health

Net's assets and liabilities as of the March 24, 2016 merger date.  The April 2016 Form 10-Q

stated that, "The acquisition of Health Net has been accounted for as a business combination using the acquisition method of accounting which requires assets acquired and liabilities assumed to be recognized at fair value as of the acquisition date." Centene included the caveat that, "[d]ue to the timing of the acquisition date, the Company has performed limited valuation procedures, and the valuation of nearly all assets and liabilities assumed is incomplete." But, as explained *supra* ¶77, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████.

99.    Moreover, ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ :

████████████████████████████████████████████

████████████████████████████████████████████

[Emphasis added].    ████████████████████████████████████████

████████████████████████████████████    The Board knew that Centene had such information available and delayed its reporting, but took no action to correct such incomplete disclosures.

100.    Centene and the Individual Defendants had known, yet failed to disclose, the valuation of Health Net since the pre-Merger due diligence and integration process. In Centene's prior SEC filings on September 17, 2015, September 21, 2015, and January 26, 2016, before the Merger had closed, Defendants accompanied the Company's valuation of Health Net with the following language:

*At this time, Centene does not have sufficient information as to the amount, timing and risk of cash flows of all of Health Net's identifiable intangible assets to determine their fair value.* Some of the more significant assumptions inherent in the development of intangible asset values, from the perspective of a market participant, include: the amount and timing of projected future cash flows (including revenue and profitability); the discount rate selected to measure the risks inherent in the future cash flows; and the assessment of the asset's life cycle and the competitive trends impacting the asset. However, for purposes of these unaudited pro forma condensed combined financial statements and using publicly available information, such as historical revenues, Health Net's cost structure, industry information for comparable intangible assets and certain other high-level assumptions, the fair value of Health Net's identifiable intangible assets and their weighted-average useful lives have been estimated . . . .

*Once Centene has full access to information about Health Net's intangible assets, additional insight will be gained . . . .*

[Emphasis added]. These statements were omitted from Centene's Form 10-Q dated April 26, 2016 under the pretense that Centene only now had obtained "sufficient information" and "full access" to perform a Health Net valuation. However, Centene had performed its own pro-forma "adjustments" for its auditors, Allen & Co. and Evercore, in evaluating the fairness of the Merger, and directed them to use those numbers, as early as June 2015. Centene's narrative that it had only obtained "full access" to information regarding the value of Health Net's liabilities after Merger close on March 24, 2016 was false. Centene had this information, and shared this information with the Director Defendants, during the pre-Merger due diligence process, and throughout the entire integration process reported to the Board.

**B.      Misrepresentations Regarding the Adequacy of Health Net's Reserves**

101.    On April 26, 2016, the same day that the Company reported the unaudited value of Health Net (*see supra* section VII.A), Centene held a quarterly investor conference call. During the call, Defendant Niedorff discussed the merger and stated that there were "no surprises" during "the regulatory process in California." Analyst Matthew Borsch from Goldman Sachs asked whether the "large book at Health Net [of] ACA exchange members[] – is it profitable now? . . . And what level of profitability is that?" Centene's EVP of Markets, Rone

Baldwin, responded that "the exchange business at . . . Health Net has been profitable. The one area of challenge with respect to the exchange business at Health Net has been Arizona." By contrast, Baldwin stated, for Health Net's policies in "California, [Health Net] pursue[s] a strategy . . . [t]hat has worked well for them."

102.     On May 24, 2016, Centene gave a presentation at the UBS Global Healthcare Conference. In response to an analyst's question regarding whether there had been any surprises or challenges associated with the Merger, Neidorff responded that "I think it's all been where we expected, and it's probably a little bit – it's been fine. We officially closed on the 24th, but *we had nine months ahead of that, in round numbers, working on the integration as anyone would do. So, the day that we closed, we were just implementing things we've been planning for nine months*." Neidorff stated that "*our mentality is you really start your integration when you're doing diligence even before you sign the contract*. That's when you're learning things about the Company. You should be thinking at that point what are we going to do if we consummate this deal? And so *that's been going on for a year*, and it's come – if anything, I think we're ahead of schedule." [Emphasis added].

103.     During the May 24, 2016 presentation, analyst A.J. Rice from UBS asked whether there were "any other things" that Centene had done "to bring [Health Net] . . . up to snuff in [Centene's] accounting and balance sheet?" Defendant Neidorff responded, "No, and we'll talk more about this . . . at our Investor Day coming up" on June 17, 2016, but assured shareholders that "in reality, after about 60 days you have a significant development of reserves, in the 90s. So everything we're seeing says it's fine."

104.     On June 17, 2016, Centene held an Investor Day attended by seven of Centene's executives, including Defendants Neidorff and Schwaneke. During the presentation, Defendant

Neidorff stated that "Health Net is Centene's California health plan" and presented a slide stating that Centene had applied its "reserving methodologies to Health Net's book of business."

105.    In providing an "update on the Health Net finance transaction," Defendant Schwaneke further stated that "[s]ince the acquisition we have faster visibility into financial information" and that "[o]n a monthly basis[,] Centene's finance team has been reviewing and monitoring the medical claims reserves and development."

106.    During the Q&A portion of the Investor Day, Defendant Schwaneke was asked about the Company's visibility into claims on Health Net policies.  Schwaneke stated that roughly two months after a merger, an acquiring company has "paid 85% of the claims that you ultimately think you're going to pay," so "two months out you have 85% of the claims already paid and out the door . . . .  In three months, it's over 90%" so that "give[s] you a flavor for how much information we had" regarding Health Net's claims.

107.    Analyst Dave Windley from Jefferies asked about Schwaneke's statement that there had been "no unfavorable development on the acquired Health Net medical reserves."  In response, Schwaneke reassured investors that there was merely a "potential for adjustment," but that "we haven't seen any unfavorable development" since the Company's accounting for Health Net provided on April 26, 2016.  Analyst Christine Arnold from Cowen and Company again asked about the Health Net insurance reserves, stating, "I'm sorry to beat up on it, but it's something that's really on people's minds.  You said that the reserves, there was no negative development, and is that related to both the first quarter and 2015?  Or how did 2015 develop?"  Mark Brooks, Centene's SVP and Chief Information Officer, responded that "***That's really just the opening balance sheet so that's as of the time of the transaction . . . . [T]he March 24 reserve balance includes all prior activity***."  Brooks reassured investors again that "***in total we***

*haven't seen any development on anything prior to [March] 24 [2016]*."  Adding to this point, Defendant Neidorff stated, "[t]hat's an important point that . . . the Health Net reserve issue stops at March 24 . . . ."  [Emphasis added].

C.  **The Truth Is Revealed Regarding Centene's Misrepresentations, Prompting the Filing of the Securities Action Against the Company**

108.  On July 26, 2016, Centene disclosed that the "fair value" of Health Net's liabilities was far higher than Centene had reported on April 26, 2016.  In a Form 10-Q that the Company filed with the SEC on July 26, 2016, Centene *increased Health Net's medical claims liability reserves by approximately $90 million*.  The Company stated during an investor conference call held the same day that this increase was "really . . . for prior issues" that were "as of March 24[, 2016]" and were "associated with disputed substance abuse treatment center claims."  When analyst Chris Rigg from Susquehanna Financial Group asked whether "the $90 million is basically for the 27-ish month of really 2014, 2015 and about three months of 2016," Defendant Schwaneke confirmed that the $90 million increase in reserves as for "everything prior to March 24[, 2016]."  Centene further disclosed on July 26, 2016 that all of the $90 million in increased liabilities related to the substance abuse-related claims in California.

109.  The Company also disclosed on July 26, 2016 that it had recognized additional liabilities in the Health Net business of "*approximately $300 million . . . based on costs trends existing prior to the acquisition date*."  [Emphasis added].  The Company filed a Form 8-K on July 26, 2016 further explaining the composition of the $300 million in recognized liabilities and admitting that Centene had already been taking corrective action to remedy the known, increased liabilities:

- $125 million associated with the California commercial business, $50 million of which is associated with substance abuse treatment facilities. We have filed for a combination of price increases and benefit design changes including reductions in reimbursement for out of network

services. We are in the final stages of approval with the California Department of Insurance, which will be concluded by the end of the third quarter of 2016.

- $70 million associated with the Arizona individual commercial business. We will exit the entire individual PPO business, effective January 1, 2017. We are reducing our participation in the health insurance marketplace business to one county for 2017 and have taken significant rate actions.

- $70 million associated with the Medicare business. The 2017 bids have been submitted and should return the business to profitability in 2017.

- $15 million associated with the Arizona Medicaid business. We have fully transitioned this business to Centene's operating platform as of July 1, 2016, and we have taken appropriate actions to improve performance.

- $20 million of other smaller items including the Arizona small group and Oregon individual business. We have filed for rate increases and taken other appropriate actions to address these for 2017.

110. Centene's massive July 26, 2016 accounting changes significantly impacted Centene's accounting for the Health Net assets acquired and liabilities assumed in the Merger. Centene reported that Health Net's medical claims liabilities were $92 million higher, its accounts payable and accrued expenses were $102 million higher, its total liabilities were $211 million higher, and its net assets $245 million lower than Centene had reported on April 26, 2016. In particular, and in contrast to the figures presented in the April 2016 Form 10-Q, Centene accounted for Health Net as follows:

| Assets acquired and liabilities assumed | | |
|---|---|---|
| Cash and cash equivalents | $ | 1,368 |
| Premium and related receivables | | 1,086 |
| Short term investments | | 82 |
| Other current assets | | 638 |
| Long term investments | | 1,966 |
| Restricted deposits | | 36 |
| Property, software and equipment, net | | 41 |
| Intangible assets | | 1,500 |
| Other long term assets | | 204 |
| Total assets acquired | | 6,921 |
| | | |
| Medical claims liability | | 1,462 |

| | |
|---|---:|
| Borrowings under revolving credit facility | 285 |
| Accounts payable and accrued expenses | 2,030 |
| Return of premium payable | 375 |
| Unearned revenue | 117 |
| Long term deferred tax liabilities | 349 |
| Long term debt | 418 |
| Other long term liabilities | 452 |
| Total liabilities assumed | 5,488 |
| | |
| Total identifiable net assets | 1,433 |
| Goodwill | 3,850 |
| Total assets acquired and liabilities assumed | 5,283 |

111.     The $390 million in increased liabilities were massive in context, greatly eclipsing the pre-tax earnings of the entire Health Net company in recent years.  In 2013 and 2014, Health Net averaged only $235 million annually in pre-tax earnings.  The over $300 million in increased liabilities for 2016 greatly outstripped those annual earnings figures.

112.     Centene accounted for the approximately $300 million in increased liabilities for the period of March 25, 2016 through December 31, 2016 using a "premium deficiency reserve," or "PDR."  PDRs are required when there is a probable loss on unearned insurance premiums.  As alleged in the Securities Action, Centene's use of purchase accounting rules to record the PDR violated GAAP.

113.     Before the market closed on July 26, 2016, Centene executives made further admissions that they knew of Health Net reserve issues before the March 24, 2016 Merger, and thus before the filing of the April 26, 2016 Form 10-Q.  In response to analyst questions regarding the extent to which the PDR was related to substance abuse issues and "how much of the PDR is actually really resolved," Defendant Neidorff stated that "*we knew some of this was there*," and that "*[t]his is something we inherited.  And it was prior to the 24th [of March] when those things were set.*"  [Emphasis added].  Defendant Schwaneke further stated that the $300 million PDR "was based on information as of March 24."

114. Defendants further explained that the substance abuse issue with Health Net's California individual business was due to known policy "plan design." Neidorff stated that he had "***personally been involved in and pushing and discussing***" changes to the policy plan design, as Centene had been "***working with the states at the highest levels to redesign the PPO product***" and "[t]here were major flaws in it." [Emphasis added]. Neidorff stated that Centene had been working on the plan design "for the past several months" and that the increased liabilities recognized on July 26, 2016 regarded "a whole list of issues that have been dealt with very aggressively." Neidorff stated, "I've had several meetings personally with Commissioner Jones," and continued: "We've talked about it . . . We've talked about the actions we are taking" and "we are being very aggressive in fixing it." Defendants stated that "the issue we had in the PPO is isolated to the PPO products in California" and "[w]e have taken steps to mitigate the substance abuse treatment center costs in the individual commercial business in California, including modifications to plan design."

115. The Board of Directors, ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

116. ████████████████████████████████████ to the Board on ████████████
████████████████ The Board received the ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ [Emphasis added].

117. The Board also learned through the ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ The Board also

learned that this ████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ [Emphasis added].

118. On June 23, 2017, CDI issued an Order to Show Cause against Health Net, identifying the complaints CDI had received from substance abuse centers for the company's failure to remit payments and other failures to handle claims payments in good faith. CDI declared in the order that, "Health Net's payment [] methodology is improper and resulted in the underpayment and unfair settlement of claims," attempting to use payment terms not included in the policies as written. CDI also made clear that Health Net violated California law in refusing these payments, including the California Unfair Competition Law and the Mental Health Parity and Addiction Equity Act of 2008.

119. On July 17, 2017, a securities fraud class action complaint was filed in the Eastern District of Missouri, *Sanchez v. Centene Corp.*, 4:17-cv-00806-AGF, alleging that Centene and Defendants Neidorff and Schwaneke violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 for their statements regarding Health Net's valuation and reserves for the period between April 26, 2016 and July 25, 2016 (the "Securities Action").

120.     As the Securities Action alleges, because Centene accounted for $300 million of the $390 million in increased liabilities from the July 26, 2016 Company disclosures using purchase accounting rules (in violation of GAAP), there was no impact on Centene's income statement.  However, Centene executives admitted that, without the Company's use of purchase accounting rules regarding the material PDR changes, Centene's quarterly pre-tax earnings would have been reduced by $300 million (84%), severely impacting the earnings per share metric that the Company reported to analysts and investors.  As a result, on July 26, 2016, the price of Centene common stock declined by $6.39 per share, approximately 8.5%, erasing over $1 billion of shareholder value on high trading volume.

121.     Following the July 26, 2016 disclosures, Defendants reiterated that the $90 million and $300 million increased liabilities were due to claims experience that had increased long before the Company's corrective disclosures.  On July 27, 2016, Defendant Neidorff was interviewed by television host Jim Cramer regarding the July 26, 2016 accounting changes. Cramer stated that it was a "red flag" that Centene had "increased its substance abuse treatment cost reserves by $90 million as well as recording a $300 million premium deficiency reserve for its business in Arizona, California, and Oregon – that's what upset people."  Neidorff stated that there had been "some issues in California with the individual plan, there were problems in Arizona with non-profitable business," and admitted that "*[w]e knew this when we bought it*." Neidorff admitted that "*before [Centene] closed*" the Merger, they "knew" that the California policies "had a bad product design" and the Individual Defendants were "working very closely with the [California] Department of Insurance" regarding it.  [Emphasis added].

## VIII.  DERIVATIVE ALLEGATIONS

122.    Plaintiffs brings this action derivatively in the right of and for the benefit of Centene to redress the breaches of fiduciary duty and other violations of law committed by the Individual Defendants, as alleged herein.

123.    Plaintiffs will adequately and fairly represent the interests of Centene and its shareholders in enforcing and prosecuting the Company's rights, and Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.  Plaintiffs have continuously held Centene stock throughout the Relevant Period and will continue to hold Centene stock through the resolution of this action.

124.    Plaintiffs have not made a pre-suit demand on the Board to assert the claims set forth herein against the Individual Defendants because such a demand would have been futile, and is thereby excused, since the allegations herein, at a minimum, permit the inference that the directors lack the requisite disinterest to determine fairly whether these claims should be pursued.

## IX.  DEMAND FUTILITY ALLEGATIONS

125.    The Director Defendants have instituted several measures that entrench their positions and are antithetical to their accountability to shareholders, including: imposing a staggered board and "classes" of directors, so that only two or three directors are answerable to public shareholders at any given annual meeting; and limiting shareholder proxy access to a 30-day period, instituting a "maximum number" of two shareholder nominees per annual meeting and imposing other restrictions on shareholder proxy access.

126.    It is clear that a pre-suit demand on the Centene Board of Directors would be a futile and useless act for the following reasons:

(a)     The Centene Board is beholden to Defendant Neidorff, the Company's Chairman and CEO, who personally orchestrated the Merger and publicly stated that he knew before the close of the Merger that Health Net's individual California policies were poorly designed and incurring greater than expected losses;

(b)     Centene's Proxy Statement filed with the SEC on March 10, 2017 expressly states that Defendant Neidorff is not independent according to New York Stock Exchange ("NYSE") rules;

(c)     The public statements by Health Net regarding its own dramatic claims increases in California; the extensive due diligence the Board conducted before the Merger regarding Health Net's business; the Board's unanimous approval of the Merger and execution and filing of the Proxy; the Board's knowledge of the regulatory scrutiny of the Merger, delaying the closing date of the Merger, and the financial consequences presented to the Board regarding such delay; Executive Vice President of International Operations and Business Integration Brinkley's, constant implementation and integration updates to the Board regarding Centene's integration with Health Net; the key financial figures provided to the Board showing that Health Net's assets and liabilities were not as reported in the Proxy that they had executed and filed with the SEC; their continuing failure to correct the information purported to support their unanimous approval of the Merger; the Board's review, authorization and filing of the Company's later financial statements that continued to misstate Health Net's financials and that became the subject of a securities class action against the Company until the true nature of the Company's business was finally revealed on July 26, 2016; the artificial inflation of the price of Centene common stock; the authorization of the share repurchases causing the Company to repurchase its own shares at fraud-inflated prices; all constitute knowing and active personal participation by

the Director Defendants of the misconduct alleged herein, and are breaches of fiduciary duty that disqualify them from impartially considering demand;

(d)     Director Defendants Eppinger, Roberts, and Escarra, as members of the Audit Committee, are also disqualified from considering demand due to their complicity in the misconduct described herein and their failure to uphold their fiduciary duties, as described in the Audit Committee Charter, to review the Company's audited financial statements and other financial reporting and ensure that the Board provides sufficient internal control over financial reporting;

(e)     Director Defendant Escarra is additionally disqualified from considering demand due to her past position as a director of Health Net from July 2006 until the close of the Merger on March 24, 2016.  Her past directorship on the Health Net board gave her further access to information regarding Health Net's financial condition that was not disclosed to shareholders.

(f)     The Director Defendants have also each violated Centene's Code of Conduct by: (i) unanimously approving the terms of the Merger and soliciting shareholder votes for the Merger without disclosing the true nature of Health Net's financial condition; (ii) failing to cause Centene to comply with all applicable laws and regulations, including the federal securities laws; (iii) failing to maintain internal controls, corporate governance and compliance procedures which could have caused the discontinuance, or at least abatement, of the illicit scheme; and (iv) failing to cause Centene to appropriately maintain the Company's financial statements and accurately report its financial performance on filings made with the SEC.

(g)     The Director Defendants have demonstrated a longstanding unwillingness or inability to act to uphold their fiduciary obligations to the detriment of the Company, and will

not sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein, of which there is a substantial likelihood of liability. The Individual Defendants have developed professional relationships with each other, and therefore are not able to and will not vigorously prosecute any such action.

(h)     The Director Defendants participated in and approved the wrongdoing described herein and participated in efforts to conceal or disguise those wrongs from Centene's shareholders, and are therefore not disinterested parties.  As a result of their attendance at the Board meetings in the minutes (reviewed by Plaintiffs), each of the Individual Defendants knew the adverse non-public information regarding Health Net's adverse California substance abuse claims and related financial underperformance.  Pursuant to their specific duties as Board members, the Director Defendants are charged with oversight of the Company and its compliance with the law.  The Director Defendants breached the fiduciary duties of loyalty they owed to Centene and its shareholders in that they failed to prevent and correct known securities fraud violations and false financial reporting, and acquiesced to Defendant Neidorff in allowing the Company to carry out a shareholder solicitation for the Merger based on false pretenses and incomplete financial information, thereby incentivizing continued noncompliance.  Thus, each Director Defendant is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

(i)     The Director Defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and have failed to timely institute reforms that would allow accurate financial reporting.   The Director Defendants are thus incapable of

exercising independent judgment in deciding whether to commence and vigorously prosecute this action.

(j)      Centene has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Centene any part of the damages Centene suffered and will suffer thereby.

(k)      Defendants Neidorff and Schwaneke are already defending claims in the Securities Class Action.   The Director Defendants reviewed the due diligence and other information forming the basis of the incomplete or inaccurate financial disclosures complained of in the Securities Action and herein, and as such are similarly situated to these defendants.   The participation of Defendants Neidorff and Schwaneke in the alleged securities fraud therefore disqualifies the Director Defendants from independently considering demand.

(l)      In order to bring this action for breaching their fiduciary duties, the Director Defendants would have been required to sue themselves and/or their fellow directors and executives in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

## X.      DAMAGES TO CENTENE

127.    The Individual Defendants breached their duties of loyalty and good faith by: (i) unanimously approving of the Merger and execution and filing of the Proxy, disregarding public statements by Health Net regarding its own dramatic claims increases in California and the extensive due diligence the Board conducted before the Merger regarding Health Net business; and (ii) authorizing the Company's filing of false and misleading financial statements that failed to disclose the true nature of the schemes herein described.   As a result of these breaches,

Centene has incurred significant expenses, and will continue to expend significant sums, including:

(a)     the amount of the premium Centene paid over the actual value of Health Net's business in connection with the Merger, due to the Director Defendants' failure to carry out their fiduciary duties to the Company, ██████████████████████████ ██████████████████████ ;

(b)     damages to the Company in the form of an increase to Health Net substance abuse treatment cost reserves by $90 million as well as recording a $300 million premium deficiency reserve for its business in Arizona, California, and Oregon, which was known to the Individual Defendants before entry into the Merger, in addition to any other costs incurred as a result of delaying payment to substance abuse treatment facilities;

(c)     costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts, and including the costs paid to Allen & Co. and Evercore in connection with the Merger, to render worthless opinions based on Company-adjusted financial information at the direction of the Individual Defendants;

(d)     resultant loss of business and business opportunities;

(e)     loss in market value and shareholder equity;

(f)     legal fees, costs, and amounts payable in settlement or satisfaction of the Securities Action brought against the Company related to the foregoing wrongdoing; and

(g)     the increased capital costs the Company will incur as a result of loss of market capitalization and the Company's damaged reputation in the investing community as a result of the foregoing.

128.    Centene has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties of loyalty to the Company.  Plaintiffs, as shareholders and representatives of Centene, seek damages and other relief for the Company, in an amount to be proven at trial.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 14(a) of the Exchange Act
### Against All Individual Defendants

129.    Plaintiffs incorporate ¶¶1-128 by reference and reallege each and every allegation set forth above, as though fully set forth herein, except for any allegation based on fraud, scienter, or recklessness.

130.    The Director Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131.    The Proxy was prepared, reviewed, and/or disseminated by the Director Defendants.  It misrepresented and/or omitted material facts, including material information about the Company's and Health Net's business prospects.

132.    In so doing, the Director Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

133.    The Director Defendants were negligent in filing the Proxy with these materially false and misleading statements.

134.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on whether to vote in favor of the Merger.  In addition, a reasonable investor would view a full and accurate

disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

135.     By reason of the foregoing, the Director Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

136.     The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy as described herein.

## COUNT II
### Breach of Fiduciary Duty
### Against All Individual Defendants

137.     Plaintiffs incorporate ¶¶1-136 by reference and reallege each and every allegation set forth above, as though fully set forth herein.

138.     Each of the Individual Defendants owed and owe Centene and Centene shareholders the highest fiduciary obligations of loyalty in managing the Company's affairs.

139.     As detailed above, the Individual Defendants breached their fiduciary duties of loyalty, including acting without good faith, by knowingly soliciting shareholder votes in favor of the Merger and by causing the Company to violate the federal securities laws.  The Individual Defendants were repeatedly informed through due diligence updates, financial reports, and business integration updates that the Company's statements were misleading and that the Company was violating positive law in failing to disclose the true nature of the Company's business, and that the Company lacked sufficient internal controls to properly enforce compliance with the law.

140.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Centene has suffered damages, not only monetarily, but also to its corporate image and goodwill.

**COUNT III**
**Constructive Fraud**
**Against All Individual Defendants**

141. Plaintiffs incorporate ¶¶1-141 by reference and reallege each and every allegation set forth above, as though fully set forth herein.

142. As corporate fiduciaries, the Individual Defendants owed to Centene and its shareholders a duty of candor and full and accurate disclosure regarding the true state of Centene's business and assets and their conduct with regard thereto.

143. As a result of the conduct complained of herein, the Individual Defendants caused Centene to violate the federal securities laws and to make numerous misrepresentations and/or conceal material facts from Centene's shareholders, despite the Individual Defendants' duties to ensure the Company disclosed the true facts regarding the Company's business and their control of the Company. The Individual Defendants have thus committed constructive fraud and violated their duty of candor.

144. As a direct and proximate result of the Individual Defendants' constructive fraud, Centene has suffered damages, not only monetarily, but also to its corporate image and goodwill.

**XII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A. Declaring that Plaintiffs may maintain this derivative action on behalf of Centene and that Plaintiffs are proper and adequate representatives of the Company;

B. Declaring that the Individual Defendants have breached their fiduciary duties of loyalty and candor to Centene and Centene's shareholders;

C. Determining and awarding to Centene the damages sustained by it, as a result of the breaches of fiduciary duty and other claims set forth above from each of the Individual Defendants, jointly and severally;

D.      Directing Centene to take all necessary actions to reform and improve its corporate governance and internal procedures, to enable the Company to comply with the Company's existing governance obligations and all applicable laws, and to protect the Company and its shareholders from a recurrence of the damaging events described herein, including but not limited to the following specific relief:

(i)      requiring the Company to put forward for shareholder vote resolutions for amendments to the Company's Bylaws and/or Articles of Incorporation allowing for increased shareholder proxy access, eliminating the Company's staggered Board structure, and increasing the number of Board members; and

(ii)      requiring the Company to implement additional audit, compliance, and internal control procedures;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.      Awarding pre- and post-judgment interest; and

G.      Granting such other and further relief as the Court deems just and equitable.

## XIII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 9, 2018

**ELIAS GUTZLER SPICER LLC**

 */s/ Greg G. Gutzler*
Greg G. Gutzler (EDMO Bar #48893MO)
Richard M. Elias (EDMO Bar #53820MO)
Tamara M. Spicer (EDMO Bar #54037MO)
130 S. Bemiston Ave., Suite 302
St. Louis, MO 63105
Telephone:  (314) 274-3311
ggutzler@egslitigation.com
relias@egslitigation.com
tspicer@egslitigation.com

Geoffrey M. Johnson
Scott R. Jacobsen
Jonathan M. Zimmerman
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
gjohnson@scott-scott.com
sjacobsen@scott-scott.com
jzimmerman@scott-scott.com

**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone:  (215) 792-6676
info@kehoelawfirm.com

*Attorneys for Plaintiffs Laura Wood and*
*Peoria Police Pension Fund*

## CERTIFICATION OF LAURA WOOD

I, Laura Wood, make the following certification in connection with the filing of the Verified Shareholder Derivative Complaint (the "Complaint") in the above-captioned action:

1. I currently hold __222__ shares of Centene Corporation, and have held such shares since _February 2008_.

2. I have reviewed the foregoing Complaint and know the contents thereof, and have authorized the filing of said Complaint.

3. I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4. I have selected Scott+Scott Attorneys at Law LLP and any firm with which it may affiliate for the purpose of prosecuting this action as my counsel.

5. Within the past three years, I have not sought to serve nor have I served as a class representative in any federal securities action.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to my representation of Centene Corporation shareholders as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Dated: 2-27-18

_Laura Wood_
Laura Wood

## VERIFICATION OF LAURA WOOD

I, Laura Wood, being duly sworn, depose and say:

I am a derivative plaintiff in this action. I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern me, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to me, or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: 2/27/18

_____
Laura Wood

Sworn to and subscribed before me this 27th day of February, 2018.

_____
NOTARY PUBLIC

My commission expires:

08/01/2018

MARGARET A KIRK
Notary Public - Notary Seal
State of Missouri, St Louis County
Commission # 14395037
My Commission Expires Aug 1, 2018

## CERTIFICATION OF SHAWN CURRY ON BEHALF OF
## PEORIA POLICE PENSION FUND

I, Shawn Curry, Pension Board President of the Peoria Police Pension Fund ("Peoria"), make the following certification in connection with the filing of the Verified Shareholder Derivative Complaint (the "Complaint") in the above-captioned action:

1. Peoria currently holds 1,538 shares of Centene Corporation, and has held such shares since May 2010.

2. I have reviewed the foregoing Complaint and know the contents thereof, and have authorized the filing of said Complaint.

3. Peoria did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4. Peoria has selected Scott+Scott Attorneys at Law LLP and the Kehoe Law Firm, P.C., and any firm with which they may affiliate for the purpose of prosecuting this action, as its counsel.

5. Within the past three years, Peoria has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Peoria will not accept any payment for serving as a representative party on behalf of a class beyond its pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to its representation of Centene Corporation shareholders as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Dated: 2/27/18

Shawn Curry, Pension Board President
Peoria Police Pension Fund

## VERIFICATION OF SHAWN CURRY ON BEHALF OF
## PEORIA POLICE PENSION FUND

I, Shawn Curry, Pension Board President of the Peoria Police Pension Fund ("Peoria"), make this Declaration on behalf of Peoria, and, being duly sworn, depose and say:

Peoria is a derivative plaintiff in this action. I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern Peoria, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

Peoria has not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to Peoria, or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: _2/27/18_

Shawn Curry
Pension Board President
Peoria Police Pension Fund

Sworn to and subscribed before me this 27ᵗʰ day of February 2018.



JENNIFER A HAHN
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
November 14, 2018

NOTARY PUBLIC

My commission expires:

_11-14-18_

# EXHIBIT A



Health Net, Inc.
P.O. Box 2048
Rancho Cordova, CA 95741-2048
www.healthnet.com

January 8, 2016



Dear Provider,

Health Net Life Insurance Company is conducting an inquiry with regard to services you have provided to our insureds and the proper determination of benefits payable for those services. It is important that we receive timely and accurate responses from your facility as part of this inquiry. Therefore, we ask your prompt cooperation in confirming that services and claims for insureds on the attached spreadsheet have been handled consistently with the enrollee's insurance policy and applicable federal and State laws and regulations. While this inquiry continues we are in the process of reviewing your claims.

Our inquiry relates to a number of potential concerns. First, eligibility under the applicable individual PPO policies is limited to individuals who continually reside in our defined California service area. Second, a variety of services covered under our individual PPO policies explicitly require the insured to pay for deductibles, copayments or coinsurance, including for out-of-network providers. Waiver of the deductible, copayment or coinsurance by the provider, or payment of such amounts on behalf of the patient by the provider, could raise questions as regards determination of benefits under the policy or as regards false and/or fraudulent claims. Third, in many cases these policies tie benefit determinations to "charges billed." Therefore, billings that would not be imposed on the insured in the absence of insurance or that exceed the provider's actual charges may also not be covered or could be a misrepresentation, so we need to confirm that the billed

rates for our insureds do not differ from those for other, non-Health Net patients. Fourth, payment may not be appropriate if improper payments or other consideration has been made to patients or to others to induce procurement of services from your facility. Fifth, we need to verify that all services provided and tests ordered were medically necessary.

We therefore request that the following information and documents be provided to us within fifteen (15) days of your receipt of this letter for each of the services ("Services") rendered to patients ("Patients") listed on the attached spreadsheet:

1. All documents reflecting the residence of the Patient before and after the Patient's receipt of the Services.

2. All documents reflecting the name, address and phone number for any other person listed as a contact by the Patient.

3. All documents, including but not limited to any cash receipts, checks, or credit card receipts, reflecting the application of deductibles and coinsurance, and the collection of applicable copayments from the Patients for the Services.

4. All documents reflecting billing sent to the Patients for the Services.

5. All documents referring or relating in any way to payments made to or on behalf of the Patients for any reason.

6. All documents referring or relating in any way to any payments made to, or received from, any third party (including but not limited to any broker, testing lab, physician or other healthcare provider) in connection with or related to the Patients or Services.

7. All records documenting that the Services were medically necessary.

In addition, please return with the documents an executed copy of the attached attestation confirming that the records provided are true and correct copies as well as attesting to certain facts.

Finally, you are hereby advised to preserve all documents, including but not limited to all hardcopy and electronic information, data and emails, concerning

the insureds and services listed on the attached spreadsheet. Health Net hereby reserves all legal rights in connection with this matter, including the right to institute legal proceedings to recover any amounts paid to your facility that it was not entitled to receive by reason of one or more of the potential violations of law listed in this letter, and will seek appropriate sanctions from the court for any destruction of evidence from the date of this letter forward.

All responses must be submitted to Health Net's Special Investigation Unit, P.O. Box 2048, Rancho Cordova, CA 95741-2048. In the meantime, please contact the undersigned with any questions you have. Thank you for your prompt attention to this matter.

Matthew Ciganek
Director of Special Investigations
Phone (818) 676-8654

## ATTESTATION AND VERIFICATION

I, _____, hereby attest and verify as follows:

    1.    I am the _____ [TITLE] of _____ [PROVIDER] and have personal knowledge of the facts in this document.____

    2.    Attached are true and correct copies of documents maintained in the ordinary course of business by ____ [PROVIDER] that are responsive to Health Net's letter dated January ___ , 2016 ("Letter");

    3.    In connection with the Services listed on the spreadsheet attached to the Letter (with any exceptions noted below):

    a.    _____ [PROVIDER] has applied all deductibles and coinsurance, and has collected all applicable copayments, from the Patients in ____ connection with the Services; ---

    b.    _____[PROVIDER] has not reimbursed any Patients for such deductibles, coinsurance and copayments, not has it paid any such amounts on behalf of any Patients;

    c.    _____ [PROVIDER] has submitted charges to Health Net that are the same as those billed to and collected from Patients;

    d.    _____ [PROVIDER] has not made any payments to or on behalf of Patients.

    e.    _____ [PROVIDER] has not made any payments to, or received any payments from, any third party with the intent to induce the referral of Patients for Services.

    4.    Any exceptions to the attestation and verification in paragraph 3 above are noted in Attachment A.---

Attested and verified as true and correct.-

Executed this _____ day of ___ , 2016 at _____ , California.

# EXHIBIT B

Dear Commissioner Jones:

This letter is to alert you to the inappropriate dragnet audit of California substance abuse treatment facilities by Health Net. In January and February of 2016, Health Net sent the attached audit letters to the vast majority of treatment facilities in California.

The substance abuse treatment industry has concerns that this audit is extraordinary and has never been performed for the medical/surgery part of the healthcare industry. In essence, the substance abuse treatment industry is being singled out for audit, which may be a violation of the Mental Health Parity and Addiction Equity Act. As opposed to investigating potential bad actors, Health Net has decided to audit essentially every treatment facility, placing numerous into financial jeopardy.

In addition, the Health Net audit is a retroactive audit requesting medical necessity documentation for treatment that has already been completed by our patients. The net result is to claw back reimbursements, an inappropriate tactic that results in treatment services being provided for little to no compensation. For example, no pre-authorization is required for intensive outpatient services, so treatment facilities admit patients and provide treatment only to have claims denied 120 days or more from the date of discharge. In addition, at least one treatment facility reports receiving payment from Health Net, depositing the check/s, only to discover that Health Net placed a stop payment on the funds.

Some treatment facilities report they have not been paid since November 2015. The majority found their payments suspended beginning in January and February of 2016. The withholding of payments by Health Net for services already provided has put facilities all over California at substantial financial risk due to delayed or non-payment.

The few treatment centers that have received checks report that the manner in which Health Net has consistently paid claims from January 2014-February 2016 has changed. Instead of paying 75% of billed after all co-insurance has been met, Health Net is now paying pennies on the dollar.

It has also put any potential patient currently insured by Health Net at risk because Health Net has very few in-network addiction treatment facilities and the majority of out-of-network providers are hesitant to take Health Net clients due to a lack of payment for treatment provided as far back as November of 2015. Health Net insured who need treatment now have no ability to get it with a PPO Health Net policy, which comes with very high premiums and co-insurance; they are currently ineligible to select a new insurance policy before January 1, 2017.

Further, Health Net has been issuing generic boilerplate denial letters which are in direct violation of parity. Despite the fact that the information has been provided to Health Het by the substance abuse treatment facility, denial letters request the same information numerous times. Denial letters are also requesting proof of deductible, copay and coinsurance before any claim can be processed, coupled with excessive concurrent reviews. These same requirements are not required for medical/surgical providers, which is a violation of parity.

At the beginning of 2016, Health Net cancelled PPO plans for all but two Los Angeles County geographic zip codes: 906xx and 912xx.  This forced people in treatment to seek new policies instead of focusing upon their care. This is just one example of how Health Net has created emotional and psychological distress for those suffering from a chronic brain disease, which often leads to a substance use reoccurrence/relapse.

The substance abuse treatment industry is committed to helping clients get sober. This is often a life-saving service. The Health Net practice of delaying payments, performing a dragnet audit of substance abuse treatment facilities in California, as well as forcing clients in treatment and in certain zip codes to seek new insurance policies is inappropriate. It puts Health Net insured, who need treatment for a chronic brain disease, at health risk.

Facilities that have filed formal complaints with the California Department of Insurance have received "cease and desist" letters from Health Net indicating that the facility should no longer contact Health Net employees and executives about the ongoing audit.

The Addiction Treatment Advocacy Coalition (ATAC) implores the California Department of Insurance and Attorney General to investigate the legality of the

Health Net dragnet audit and the withholding of payments for services already provided by treatment facilities. We are concerned that the audit itself violates the Mental Health Parity and Addiction Equity Act, as well as a host of other California insurance laws and regulations.

Sincerely,

List of treatment facilities and CEO/Owners